IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

GREGORY ROBINSON,

                Plaintiff,

v.                              CIVIL ACTION NO.   2:14-cv-00330

S.W. MILLER, et al.,

                Defendants.

MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendants S.W. Miller, E.M. Peterson, E.R. Moyer, and City of South Charleston's Motion for Summary Judgment ("Defendants' Motion"), (ECF No. 34), and Plaintiff's Motion for Partial Summary Judgment Against Defendants S.W. Miller, E.M. Peterson, and E.R. Moyer, (ECF No. 36). For the reasons discussed herein, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion, (ECF No. 36), and **DENIES** Defendants' Motion, (ECF No. 34), in its entirety.

*I.   Background*

This case arises out of the actions of Defendants Miller, Peterson, and Moyer (together, the "Individual Defendants") seeking arrest warrants for Plaintiff and then executing those warrants. "Plaintiff . . . resides in Charleston, Kanawha County, West Virginia, and is a citizen of the State of West Virginia." (ECF No. 1, Ex. 1 ¶ 1.) Defendant Miller "is a patrolman with the South Charleston Police Department" (the "Police Department"). (*Id.* ¶ 2.) Defendants Peterson and

Moyer are "detective[s] with the [Police Department]." (*Id.* ¶¶ 3–4.) Defendant City of South Charleston ("Defendant City") "is a political subdivision of the State of West Virginia located in Kanawha County, West Virginia." (*Id.* ¶ 5.) Defendant City "operates the [Police Department] and employs, oversees, and supervises the conduct of its officers, consisting primarily of patrol officers and detectives." (*Id.* ¶ 5.)

Defendant Miller "was dispatched to the Walmart Supercenter in South Charleston, West Virginia" (the "Walmart Store") on "July 16, 2012 . . . in response to a report of employee theft." (ECF No. 39 at 2; *see* ECF No. 97 at 1.) When he arrived at the Walmart Store, Defendant Miller met with Paul Higginbotham—the Walmart Store's Asset Protection Manager (the "Walmart APM"). (ECF No. 39 at 2; ECF No. 97 at 1.) The Walmart APM reported to Defendant Miller that surveillance video showed three employees stealing Apple iPods. (ECF No. 39 at 2; ECF No. 97 at 1.) The Walmart APM then showed Defendant Miller surveillance video of two thefts. (ECF No. 39 at 3.)

The first surveillance video was of a theft that occurred on July 6, 2012. (ECF No. 97 at 1.) This video included images of two Walmart Store employees—Jeremy Hartwell and Jirald Davis—and shows Hartwell removing iPods from a display case at the Walmart Store. (*Id.* at 1–2.)

The second video showed an additional theft that occurred on July 10, 2012. (*Id.* at 2.) This video included images of three Walmart Store employees—Hartwell, Davis, and Plaintiff—and again showed Hartwell removing iPods from a display case.[1] (*Id.*; *see* ECF No. 39 at 3.)

---

[1] The record includes a Walmart internal investigation report that addresses these thefts (the "Walmart Internal Report"). (*See* ECF No. 100, Ex. 6.) The Walmart Internal Report lists both the "[e]vent [s]tart [d]ate" and "[d]ate of [o]ffense" as July 6, 2012, as well as identifying the "[p]eople [i]nvolved" as Hartwell and Davis. (*Id.* at 1–3.) A handwritten note next to Hartwell's information states "Main Guy," and an additional handwritten note next to Davis's

information states "Suspect #2." (*Id.* at 2–3.) The Walmart Internal Report also includes the following typed statement by the Walmart APM with a listed "[c]reated date" of July 13, 2012:

> On Wednesday, July 11, 2012, I, Paul Higginbotham, APM, was notified by Matt Wills, APA, of a possible internal case involving an electronics associate, Jeremy Hartwell, involving the theft of merchandise/property from the electronics department to [sic] include Apple Ipod MP3 players.
>
> Upon my return to the facility on Thursday, July 12, I begin [sic] an investigation of the alleged theft of merchandise/property from the electronics department. Upon my initial investigation, the Asset Protection Associate had video surveillance [sic] from previous days also saved at which time I reviewed these surveilance [sic] clips from the electronics department. The first day of video was from Friday, July 6, 2012. Upon observing surveillance [sic] video, it reveals the associate, Jeremy Hartwell, working in the area of Register 68, where our Ipads, digital cameras, MP3 players, etc… are displayed. At 11:53, associate Jeremy Hartwell is observed proceeding towards the MP3 player display case with another associate, Jirald Davis, present beside him as they approach the display case. At that time, at 11:54 hours, both associates begin to look around the department and act in a suspicious manner. Associate Jirald Davis then turns his back to Associate Jeremy Hartwell, who uses the department keys and enters the MP3 display case. While entering the display case, Associate Jirald Davis begins to stretch and places his head and arms above his head and continues to look around the department. As a customer approaches, Jirald immediately proceeds to their location and directs them away from the electronics counter and MP3 player display case.
>
> The Associate Jeremy Hartwell then enters the display case and begins to select Apple Ipods where he is then observed concealing the merchandise into his left pants pocket. Associate Jirald Davis then turns around and observes the activity taken [sic] place and the selection and concealment of the merchandise. The associate continues to select additional Ipods, also placing them into his pants pocket. Upon the selection and concealment of the merchandise, associate Jeremy Hartwell then closes the display case at 11:55 hours and associate Jirald Davis immediately walks away from the area and associate and proceeds back to the register.
>
> The second day of surveillance [sic] is on Tuesday, July 10, 2012 where CCTV reveals the associate Jeremy Hartwell in the electronics department around Register 68 at the same above stated display cases. The associate proceeds towards the MP3 display case at 21:14 hours aside another electronics associate, [Plaintiff], that is working through paperwork. Associate Jeremy Hartwell enters the display case at 21:15 hours and associate Jirald Davis immediately proceeds over to this same location where he begins talking with the electronics associate [Plaintiff] that is working with paperwork. At 21:16 hours, associate Jeremy Hartwell begins to select merchandise (Ipods) from the display case concealing them into his right pants pocket as associate Jirald Davis continues to observe him and distract the other associate from noticing the activity/incident taking place. Upon selection and concealment of all merchandise, associate Jeremy Hartwell closes the display case at 21:17 hours and associate Jirald Davis proceeds to walk away towards the electronics register.
>
> Upon reviewing several other days of surveillance [sic] video from associate Jeremy Hartwell's shifts over previous weeks and Asset Protection working with ZMS Seth McCormick to verify on-hands and PI accuracy of Apple Ipods in the display case and comparing to surveillance [sic] video of the selection and concealment of merchandise, an event value was entered into the case file of $1975.00 for a total of 8 items.
>
> No merchandise has been recovered in this case as this is an ongoing investigation with Asset Protection scheduled to conduct a MIOG interview with the associate during his shift on Friday, July 13, 2012. Further case details will be updated as information is obtained in this case file.

"Shortly after reviewing the videotape, [Defendant] Miller interviewed . . . Davis at the [Walmart Store]." (ECF No. 39 at 3.) Defendant Miller later testified that Davis provided a statement to him at this time, in which Davis noted that "he knew . . . Hartwell was taking the iPods and even offered to give [Davis] one." (ECF No. 34, Ex. C (Miller Dep.) 42:19–43:22.) Defendant Miller did not speak with either Hartwell or Plaintiff before leaving the Walmart Store, as they "were both off work that day." (ECF No. 39 at 3.)

On July 18, 2012, Defendant Miller "applied for a warrant for . . . Hartwell." (ECF No. 97 at 2.) "[Defendant] Miller executed the warrant and arrested Hartwell on" the same date. (*Id.*) Either on or after this date, Hartwell provided the following signed statement on a Police Department investigative statement form (the "Hartwell Statement"):

> [Plaintiff] and [Davis] talked me into doing it again. They were suppose [sic] to cover me and block the cameras under the agreement I would give them each one of the Ipods.

(ECF No. 34, Ex. G.) The Hartwell Statement is not dated. (*See id.*)

Defendant Miller "applied for arrest warrants for Davis and Plaintiff on July 19, 2012." (ECF No. 97 at 2; ECF No. 37 at 2.) To procure a warrant for Plaintiff's arrest, Defendant Miller submitted a criminal complaint with an accompanying affidavit (the "First Warrant Application"). (ECF No. 34, Ex. A (providing the First Warrant Application, which lists Plaintiff as the "Defendant" and Defendant Miller as the "Complainant").) This criminal complaint alleges that, "[o]n or about 07-12-2012 in Kanawha County, West Virginia," Plaintiff committed the offenses of embezzlement in violation of West Virginia Code § 61-3-20 and fraudulent schemes in violation of West Virginia Code § 61-3-24d. (*Id.* at 1.) This criminal complaint further states that the

---

(*Id.* at 5.)

4

"complaint is based on" an attached affidavit (the "First Warrant Affidavit"). (*See id.*) The First

Warrant Affidavit "was in all respects identical" to the affidavits Defendant Miller submitted to

procure the arrests of Hartwell and Davis. (ECF No. 97 at 2.) The First Warrant Affidavit provides

the statutory language for the offenses of embezzlement and fraudulent schemes. (ECF No. 34,

Ex. A at 2.) The First Warrant Affidavit also includes a "facts" section, which provides the

following, in its entirety:

> On Monday 16th day of July 2012, I was dispatched to Wal-Mart located at 2700
> Mountaineer Blvd. for a report of employee stealing. Upon arrival I spoke with
> listed comp. Paul Higginbotham the store APM who stated that 3 employees had
> been stealing Apple IPods and accessories from the electronic department. Mr.
> Higginbotham stated that when he reviewed the surveillance videos on Thursday
> 12th day of July and saw that on Friday July 6th he saw [sic] listed suspect #1
> Jeremy Hartwell and listed suspect #2 Jirald Davis were observed [sic] proceeding
> towards the MP3 player display case. At around 11:54 hours, both suspects begin
> to look around the department and act in a suspicious manner. Mr. Davis then turns
> his back to Mr. Hartwell who uses the department keys and enters the MP3 display
> case. While Mr. Hartwell enters the case Mr. Davis begins to stretch and places his
> arms above his head and continues to look around the department. As a customer's
> [sic] approaches Mr. Davis proceeds to their location and directs then [sic] away
> from the electronics counter and MP3 player display case.
>
> Mr. Hartwell then enters the display case and begins to select Apple IPods
> where he is then observed concealing the merchandise into his left pocket. Mr.
> Davis then turns around and observes the activity taken [sic] place and selection
> and concealment of the merchandise. Mr. Hartwell continues to select additional
> IPods, also placing them into his pant pocket. After Mr. Hartwell finishes his
> selection and concealment both suspects walks [sic] away from the area.
>
> The second incident happened on Tuesday July 10th were [sic] Mr. Hartwell
> was standing by the same display case. Mr. Hartwell then proceeded towards the
> MP3 display case around 2114 hours along with suspect #3 [Plaintiff] and Mr.
> Hartwell enters the case at 2115 hours and Mr. Davis immediately proceeds over
> to the same location where he begins to talk to [Plaintiff]. At 2116 hours Mr.
> Hartwell begins to select merchandise (IPods) from the display case concealing
> them into the right pants pocket and Mr. Davis continues to observe him and distract
> the other associate from noticing the activity. After concealing the items Mr.
> Hartwell closes the display case at 2117 hours and Mr. Davis proceeds to walk
> away towards the electronics register.
>
> Mr. Higginbotham stated after reviewing several other days of surveillance
> video from Mr. Hartwell's shifts over previous weeks and Asset Protection working

5

with ZMS Seth McCormick to verify on-hands and PI accuracy of Apple IPods in the display case and comparing to surveillance video of the selection and concealment of merchandise, an event value was entered into the case file of $1975.00 for a total of 8 items. I spoke with Mr. Davis in the LP office at Wal-Mart and before he could be given his Miranda's Warning he stated he knew Mr. Hartwell was taking the items and even offered to give him one but Mr. Davis stated he didn't take any and didn't help Mr. Hartwell. There are videos of all the items that were taken by Mr. Hartwell. I will be obtaining warrants on all 3 suspects for Embezzlement and Fraudulent Schemes.

   On Tuesday 17th day of July 2012, I spoke with Greg Eads who works at Kanawha Valley Fine Jewelry #4 in Dunbar and he stated that Jeremy Hartwell had sold them a [sic] Apple Touch 64GB IPod and the numbers match with the ones that he stole from Wal-Mart. While looking at his other IPod in the case I found one that was similar to the one that Mr. Hartwell had sold them, the numbers match the ones that were stolen by Mr. Hartwell. Mr. Eads stated that a girl name [sic] Billie Joe Jones Ohio ID# RP283283 had sold it to them the same day that Mr. Hartwell sold his. This occurred at Wal-Mart located at 2700 Mountaineer Blvd. South Charleston, WV 25309 Kanawha County.

(*Id.* at 2–3.) Defendant Miller did not provide any additional oath or affirmation detailing the facts surrounding these incidents other than the First Warrant Affidavit—and the accompanying criminal complaint—when procuring an arrest warrant for Plaintiff. (*See* ECF No. 35 at 2; ECF No. 97 at 2.)

   A Kanawha County magistrate judge subsequently issued warrants for Hartwell, Davis, and Plaintiff. (ECF No. 35 at 2.) The magistrate judge issued the warrant for Plaintiff (the "First Warrant") based on the First Warrant Application. (*Id.*) "Plaintiff was on vacation from July 13, 2012 to July 27, 2012 and voluntarily turned himself in on July 30, 2012." (*Id.*) "Plaintiff's preliminary hearing was scheduled for August 8, 2012." (*Id.*) "Neither [the Walmart APM] nor [Defendant] Miller appeared at the preliminary hearing and the charges were dismissed" without prejudice. (*Id.*; *see also* ECF No. 37 at 5 ("The case against [Plaintiff] was dismissed without prejudice at the preliminary hearing held on August 8, 2012, because neither [Defendant] Miller, . . . nor any witnesses from Walmart showed up at the hearing to testify."). *See generally* ECF 97

6

at 3 (providing Defendants' assertion that "[n]either [the Walmart APM] nor [Defendant] Miller received subpoenas to appear at the August 8th preliminary hearing and in accordance with the prosecutor's instructions, did not attend the hearing").)

"Walmart had suspended both Davis and Plaintiff without pay, pending the resolution of the criminal complaint" against these individuals. (ECF No. 97 at 3; *see* ECF No. 101 at 5 ("[P]ursuant to Walmart's policy, [Plaintiff] had been suspended without pay pending the outcome of the investigation/arrest.").) "Walmart wanted a more substantive resolution than a dismissal for failure to appear before they offered Plaintiff his job back." (ECF No. 101 at 5; *see* ECF No. 97 at 4 ("Walmart wanted a dismissal on the merits, not one merely resulting from a failure to appear.").)

Sometime between August 8, 2012 and November 20, 2012, Defendants Peterson and Moyer—who worked regularly around the Walmart Store in a plain-clothes capacity—spoke with the Walmart APM regarding Plaintiff. (ECF No. 39 at 5.) Defendant Peterson testified that the Walmart APM mentioned to Defendants Peterson and Moyer that he attempted to contact Defendant Miller following the August 8, 2012 preliminary hearing regarding Plaintiff, but was unsuccessful. (*See id.*; *see also* ECF No. 34, Ex. E (Peterson Dep.) 128:8–15.) Defendant Peterson also testified that, during one such conversation, the Walmart APM asked Defendants Peterson and Moyer to "handle" the issue with Plaintiff. (*See* ECF No. 39 at 5; *see also* ECF No. 34, Ex. E (Peterson Dep.) 133:2–6.)

Following these conversations, Defendants Peterson and Moyer consulted with one of two prosecutors by telephone before seeking an arrest warrant for Plaintiff—"Assistant Prosecuting Attorney Joey Spano or Assistant Prosecuting Attorney Reagan Whitmyer." (*E.g.*, ECF No. 34, Ex. E at 117.) Based on this conversation, the prosecutor told Defendants Peterson and Moyer to

re-file charges against Plaintiff. (*See, e.g.*, *id.* (providing the following interrogatory response from Defendants: "Sometime after Paul Higginbotham requested that [Defendants] Moyer and Peterson re-file the charges against [Plaintiff] and before November 7, 2012, [Defendants] Moyer and Peterson spoke with either Assistant Prosecuting Attorney Joey Spano or Assistant Prosecuting Attorney Reagan Whitmyer by telephone and provided a summary of the case and were told to re-file the charges" (emphasis added)).)

On November 20, 2012, Defendants Peterson and Moyer re-filed an arrest warrant application against Plaintiff (the "Second Warrant Application"). (ECF No. 35 at 2; ECF No. 39 at 5. *See generally* ECF No. 97 at 3 (providing Defendants' statement that "[o]n or about November 20, 2012, [Defendants] Peterson and Moyer re-filed the criminal complaint against [both] Jirald Davis and . . . Plaintiff pursuant to a request from [the Walmart APM]").) As with the First Warrant Application, the Second Warrant Application similarly includes a criminal complaint with an accompanying affidavit. (ECF No. 34, Ex. B (providing the Second Warrant Affidavit, which lists Plaintiff as the "Defendant" and Defendants Peterson and Moyer as the "Complainant[s]").) This second criminal complaint alleges that "[o]n or about 10,12 [sic] July 2012 in Kanawha County, West Virginia," Plaintiff committed offenses "in violation of W. Va. Code . . . §61-3-20, §61-3-24d." (*Id.* at 1.) Additionally, as with the first complaint against Plaintiff, this second complaint states that the "complaint is based on" an attached affidavit (the "Second Warrant Affidavit"). (*See id.*) The Second Warrant Affidavit provides the statutory language for the offenses of embezzlement and fraudulent schemes. (*Id.* at 2.) The Second Warrant Affidavit also includes a "facts" section—typed in all capital letters—which provides the following, in its entirety:

> On 16 July 2012, Ptlm. SW Miller was dispatched to Wal-Mart Located at
> 2700 Mountaineer Blvd. South Charleston, Kanawha County WV, for a report of

employee theft. Upon arrival Miller spoke with Wal-Mart asset protection manager Paul Higginbotham (complainant) who states that three employees had been stealing Apple I Pods and accessories from the electronic department. Higginbotham stated that he reviewed video surveillance on 06 July 2012 and observed Jeremy Hartwell (co-defendant) and Jirald Davis (defendant) proceed toward the MP3 player display case in the electronic section of the store and begin to look around the area in a suspicious manner. Davis then turns his back to Hartwell who uses department keys and enters the MP3 display case. Hartwell enters the case and Davis begins to stretch and place his arms about his head while looking around the area. When a customer approaches the area Davis is observed directing their attention away from the electronics counter where Hartwell has selected an Apple I-Pod and concealed it in his left pocket. Davis then watches as Hartwell selects additional Apple I-Pods and conceals them in his pocket, after the selection and concealment of the Apple I-Pods both defendants then walk away from the area.

On 10 July 2012 Hartwell was observed on video surveillance by Higginbotham again at the same MP3 display case. Hartwell with [Plaintiff] (co-defendant) present again enters the case selecting and concealing Apple I-Pods into his right pant pocket. Davis again is immediately observed coming to the location, speaking with [Plaintiff], and appears to distract the other associates from noticing the activity.

Higginbotham states after completing their internal investigation that eight Apple I-Pods were taken with a total loss to Wal-Mart of $1975.00. On 17 July 2012 Miller recovered two of the Apple I-Pods from Greg Eads who works at Kanawha Valley Fine Jewelry and Loan in Dunbar. Eads states that Hartwell brought in one of the stolen Apple I-Pods in for sell [sic] and then the same day a female brought in another of the stolen I-Pods for sell [sic]. Both Hartwell and the female sold the items to KVP and were given $150.00 US currency for each transaction. [Plaintiff] is charged with embezzlement and fraudulent schemes.

(*Id.* at 2–3.) Defendants Peterson and Moyer did not provide any additional oath or affirmation detailing the facts surrounding these incidents other than the Second Warrant Affidavit—and the accompanying criminal complaint—when procuring an arrest warrant for Plaintiff. (*See, e.g.*, ECF No. 42 at 8.)

A magistrate judge subsequently issued an arrest warrant for Plaintiff (the "Second Warrant"), as well as a warrant for Davis. (ECF No. 35 at 3; *see also* ECF No. 97 at 4.) "[Plaintiff] and Davis voluntarily turned themselves in and were arraigned on November 28, 2012." (ECF No.

9

97 at 4.) "[Their] preliminary hearing was set for December 13, 2012." (*Id.*) "At the December 2012 preliminary hearing, Davis took a plea bargain and Plaintiff asked for a continuance which was granted." (*Id.*) "[Plaintiff's] preliminary hearing was held on January 10, 2013." (ECF No. 35 at 3.) "Although [Defendants] Moyer and Peterson were present at the hearing, . . . they were never called to testify." (ECF No. 97 at 4; *see also* ECF No. 39 (noting that the Walmart APM testified at the January 10, 2013 hearing "and both [Defendants] Peterson and Moyer were present and available to testify"); *cf.* ECF No. 97 at 4 (providing Defendants' assertion that "[t]he prosecutor did not show the security videos and did not offer Hartwell's sworn statement implicating Plaintiff in the theft" at the January 10, 2013 hearing).) At the conclusion of this hearing, the magistrate judge "dismissed the case without prejudice for lack of probable cause." (ECF No. 97 at 4; *see also* ECF No. 39 at 6 ("This second case against [Plaintiff] was dismissed at the preliminary hearing held on January 10, 2013, when Magistrate Judge Peter Lopez found that probable cause did not exist.").)

On December 13, 2013, Plaintiff filed the instant Complaint against Defendants in the Circuit Court of Kanawha County, West Virginia. (*See* ECF No. 1, Ex. 1.) The Complaint includes the following five counts: (1) Count I includes two claims against Defendant Miller pursuant to 42 U.S.C. § 1983—(a) that he sought an arrest warrant for Plaintiff based on an affidavit that "failed to establish probable cause," and (b) that he arrested Plaintiff "without probable cause," (*id.* ¶¶ 29–37); (2) Count II includes the same two claims against Defendants Peterson and Moyer pursuant to Section 1983—(a) that these Defendants sought an arrest warrant for Plaintiff based on an affidavit that "failed to establish probable cause," and (b) that they arrested Plaintiff "without probable cause," (*id.* ¶¶ 38–47); (3) Count III includes a Section 1983 claim against Defendant

City, which alleges that it is "independently liable" for failing to "provid[e] proper training, management, or oversight of its officers with regard to the constitutional rights of individuals,"[2] (*id.* ¶¶ 48–58); (4) Count IV is a malicious prosecution claim against Defendant Miller pursuant to "the statutes and common law of the State of West Virginia," (*id.* ¶¶ 59–65); and (5) Count V is similarly a malicious prosecution claim against Defendants Peterson and Moyer pursuant to "the statutes and common law of the State of West Virginia," (*id.* ¶¶ 66 –72). The Complaint requests a broad array of relief, including compensatory and punitive damages, injunctive relief, prejudgment interest, and attorney's fees. (*Id.* ¶ 73.)

Defendants removed this case on January 3, 2014, invoking this Court's federal question jurisdiction. (ECF No. 1.) On December 22, 2014, Defendants filed Defendants' Motion, which requests summary judgment on all of Plaintiff's claims. (ECF No. 34.) Plaintiff filed his opposition briefing to this motion on January 5, 2015, (ECF No. 39), and Defendants filed their reply briefing in support of this motion on January 12, 2015, (ECF No. 42).

On December 24, 2014, Plaintiff filed Plaintiff's Motion, in which he requests summary judgment only as to the claims in Counts I and II that the Individual Defendants violated his civil rights by seeking a warrant based on affidavits that failed to establish probable cause (the "Deficient-Affidavit Claims"). (ECF No. 36.) Defendants filed their opposition briefing to Plaintiff's Motion on January 5, 2015, (ECF No. 38), and Plaintiff filed his reply briefing in support of this motion on January 12, 2015, (ECF No. 43).

---

[2] Count III also includes a claim that Defendant City "is vicariously liable for the negligence of [the Individual Defendants] in depriving Plaintiff . . . of his constitutional rights and privileges." (ECF No. 1, Ex. 1 ¶ 52.) However, the Court dismissed this claim during a March 10, 2015 hearing in this case. (*See* ECF Nos. 83 & 85.)

During the March 10, 2015 hearing in this matter, the Court noted that there was an outstanding discovery issue and provided the option to the parties to supplement their summary judgment briefing at the close of discovery. Defendant accepted this offer and filed supplemental briefing in support of Defendants' Motion on May 22, 2015. (ECF No. 97.) Plaintiff filed his opposition memorandum to this supplemental briefing on June 1, 2015, (ECF No. 100), and Defendants filed their supplemental reply briefing on June 5, 2015, (ECF No. 101).

As such, both Defendants' Motion and Plaintiff's Motion are fully briefed and ready for disposition. The jury trial in this case is currently scheduled to begin on September 15, 2015. (ECF No. 106.)

## II.  Legal Standard

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment.[3] That rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). When construing such factual issues, the Court must view the evidence "in the light most favorable to

---

[3] In the "Standard of Review" sections in Defendants' briefing regarding Defendants' Motion, Defendants repeatedly suggest that the appropriate standard is a curious amalgamation of the standards applicable to motions for judgment as a matter of law and motions for judgment notwithstanding the verdict. (*See* ECF No. 35 at 3–4; ECF No. 97 at 6.) However, Defendants' Motion—read as a whole—clearly indicates that this filing is a motion for summary judgment. (*See* ECF No. 35.) As such, despite the apparently errant standard proffered in Defendants' briefing, the Court construes Defendants' Motion as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and shall apply the appropriate standard for such a motion.

the [party opposing summary judgment]." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Liberty Lobby*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial." *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff." *Id.* at 252.

### III.  Section 1983 Claims Against the Individual Defendants

Defendants first argue that the Court should grant summary judgment in their favor as to both claims brought pursuant to 42 U.S.C. § 1983 in Counts I and II: (1) the Deficient-Affidavit Claims; and (2) the claims that the Individual Defendants arrested Plaintiff without probable cause (the "Section 1983 Malicious Prosecution Claims"). (*See, e.g.*, ECF No. 35 at 4–15.) Plaintiff, in

13

turn, moves for summary judgment as to his Deficient-Affidavit Claims in Counts I and II.[4]  (ECF

No. 37 at 1–2, 6–10.)

## A.      General Standards Applicable to Counts I and II

### 1.      Requirements of a Section 1983 Claim and the Constitutional Right Allegedly Infringed by the Individual Defendants

Counts I and II include civil rights claims against the Individual Defendants pursuant to 42

U.S.C. § 1983. (ECF No. 1, Ex. 1 ¶¶ 29–47.) "Section 1983 is a codification of § 1 of the Civil

Rights Act of 1871," *Kalina v. Fletcher*, 522 U.S. 118, 123 (1997), and provides the following, in

pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "The text of [Section 1983] purports to create a damages remedy against every

---

[4] In Plaintiff's Motion, Plaintiff provides the following statement:

> Plaintiff seeks summary judgment on his section 1983 claims against the [Individual Defendants] . . . on the grounds that they violated his rights under the Fourth Amendment of the United States Constitution by seeking arrest warrants *and carrying out arrests pursuant to those warrants* where a finding of probable cause was not supported by accompanying oath or affirmation. . . . Plaintiff is *not* seeking summary judgment on his malicious prosecution claims, his claims against the City of South Charleston, *or his claims that the individual police officers violated his constitutional rights by arresting him without probable cause*.

(ECF No. 37 at 1–2 (emphasis added); *cf.* ECF No. 43 at 1 ("[Plaintiff's Motion] . . . and his supporting Memorandum . . . are premised on the faces of the arrest warrant applications and supporting affidavits."); *id.* at 2 ("[I]n the instant summary judgment motion Plaintiff is merely arguing that no genuine dispute exists as to whether the respective warrant applications satisfy the constitutional requirement of establishing probable cause by oath or affirmation.").) As indicated by this passage, Plaintiff provides conflicting statements regarding whether he moves for summary judgment based on his claims that the Individual Defendants violated his civil rights when they arrested him. (*See* ECF No. 37 at 1–2.) The remainder of Plaintiff's briefing relating to Plaintiff's Motion does not address his allegations regarding the execution of the warrants and, instead, focuses on his claim that the Individual Defendants violated his rights by submitting allegedly deficient warrant affidavits. (*See* ECF No. 37; ECF No. 43.) The Court therefore construes Plaintiff's Motion as requesting summary judgment only as to his Deficient Affidavit Claims in Counts I and II.

state official for the violation of any person's federal constitutional or statutory rights." *Kalina*, 522 U.S. at 123. "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "To maintain a § 1983 action, [a plaintiff] must show that: (1) he has been deprived of a right secured by the Constitution and the laws of the United States, and (2) that the defendants deprived him of this right while acting under 'color of any [law].'" *Tincher v. Fink*, No. Civ. A. 2:03-0030, 2005 WL 1845319, at *3 (S.D. W. Va. Aug. 2, 2005) (second alteration in original) (citation omitted); *see also Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997) ("Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law.").

"The first step in any [Section 1983] claim is to identify the specific constitutional right allegedly infringed." *Albright*, 510 U.S. at 271 (citations omitted). Counts I and II do not specifically address which constitutional rights the Individual Defendants allegedly infringed. (*See* ECF No. 1, Ex. 1 ¶¶ 29–47.) However, the parties are in agreement that Plaintiff's Section 1983 claims in Counts I and II allege violations of Plaintiff's civil rights under the Fourth and Fourteenth Amendments. (*See, e.g.*, ECF No. 8 at 1, 7–8 ("Plaintiff's Complaint . . . sets forth a . . . claim for relief under 42 U.S.C. § 1983 against [the Individual Defendants] for violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution."); ECF No. 35 at 5 ("Although Plaintiff has not articulated which constitutional amendments the officers violated, . . . [Defendants] presume[] he is alleging violation[s] of due process under the Fourth and Fourteenth Amendments to the United States Constitution.").) The Court therefore construes

15

Counts I and II as constituting Section 1983 claims against the Individual Defendants alleging the infringement of Plaintiff's rights under the Fourth and Fourteenth Amendments.

      2.   <u>Qualified Immunity</u>

Defendants argue, in part, that the Individual Defendants are shielded from liability for Plaintiff's Section 1983 claims by the doctrine of qualified immunity. (*See, e.g.*, ECF No. 35 at 4–15.) "Under the doctrine of qualified immunity, a government official is not personally liable for damages resulting from his actions if his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *West v. Murphy*, 771 F.3d 209, 213 (4th Cir. 2014) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity takes cognizance of human imperfections." *Id.* "Implicit in the idea that officials have some immunity . . . for their acts, is a recognition that they may err and that it is better to risk some error and possible injury from such error than not to decide or act at all." *Id.* "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014). "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right [.]'" *Id.* (alterations in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Under the second prong, "'[w]hether an official protected by

qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012). Stated another way, "'[t]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan*, 134 S. Ct. at 1866 (alterations in original) (quoting *Hope*, 536 U.S. at 741); *see also West*, 771 F.3d at 213 ("The law is clearly established if 'the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011))). "Existing precedent must have placed the statutory or constitutional question beyond debate." *West*, 771 F.3d at 213 (citation omitted). However, "[t]he universe of existing precedent is not unlimited." *Id.* "Courts 'ordinarily need not look beyond the decisions of the Supreme Court, [the Fourth Circuit] [C]ourt of [A]ppeals, and the highest court of the state in which the case arose.'" *Id.* (quoting *Lefemine v. Wideman*, 672 F.3d 292, 298 (4th Cir. 2012)).

"Courts have discretion to decide the order in which to engage [the] two prongs" of the qualified-immunity analysis. *Tolan*, 134 S. Ct. at 1866 (citing *Pearson*, 555 U.S. at 236). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* (citations omitted).

Defendants request summary judgment as to the Deficient-Affidavit Claims and Section 1983 Malicious Prosecution Claims in Counts I and II. (*See, e.g.*, ECF No. 35 at 4–15.) Plaintiff similarly seeks summary judgment, but only as to the Deficient-Affidavit Claims against the Individual Defendants in these Counts. (*See* ECF No. 37.) For purposes of the present analysis,

17

the Court will first address the Deficient-Affidavit Claims, then Plaintiff's Section 1983 Malicious Prosecution Claims.

**B.      Counts I and II—the Deficient-Affidavit Claims Against the Individual Defendants**

As noted, both Plaintiff and Defendants move for summary judgment as to Plaintiff's Deficient-Affidavit Claims in Counts I and II. (*See* ECF No. 35 at 4–15; ECF No. 37.) The Court first analyzes the elements of these claims, then Defendants' contention that the Individual Defendants are shielded from liability for these claims by the doctrine of qualified immunity. *Cf. Tolan*, 132 S. Ct. at 1866 (noting that "[c]ourts have discretion to decide the order in which to engage [the] two prongs" of the qualified immunity analysis (citing *Pearson*, 555 U.S. at 236)).

1.      <u>The Elements of Plaintiff's Deficient-Affidavit Claims</u>

The Court shall first analyze whether Plaintiff demonstrates that he satisfies the two required elements for his Section 1983 unconstitutional warrant affidavit claims. *See, e.g.*, *id.* (discussing the "two-pronged inquiry" in "resolving questions of qualified immunity at summary judgment"). The record reflects—and neither party otherwise contests—that the Individual Defendants acted in their capacity as law enforcement officers when they submitted the First Warrant Affidavit and the Second Warrant Affidavit. (*See, e.g.*, ECF No. 35 at 2–3; ECF No. 39 at 4–6.) The Court therefore finds that the Individual Defendants were acting under color of law when they submitted these affidavits. *See, e.g.*, *Brown v. Winders*, No. 5:11–CV–176–FL, 2011 WL 4828840, at *3 (E.D.N.C. Oct. 11, 2011) ("Acts performed by a police officer in his or her capacity as an officer, even if illegal or not authorized by state law, are considered to have been taken under color of law." (citing *Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978))).

18

The remaining Section 1983 element to consider is whether the Individual Defendants deprived Plaintiff of a constitutional right by seeking arrest warrants for Plaintiff based on these affidavits. *See, e.g.*, *Tincher v. Fink*, No. Civ. A. 2:03-0030, 2005 WL 1845319, at *3 (S.D. W. Va. Aug. 2, 2005) (noting that a requirement of a Section 1983 claim is that the plaintiff show that "he has been deprived of a right secured by the Constitution and the laws of the United States" (citation omitted)). As previously noted, Plaintiff's Deficient-Affidavit Claims allege violations of the Fourth and Fourteenth Amendments of the United States Constitution. *See generally United States v. Hersman*, Criminal Action No. 2:13–cr–00002, 2013 WL 1966047, at *3 (S.D. W. Va. May 10, 2013) (noting "the well-settled principle that the validity of a state-issued warrant will be tested by the Fourth Amendment of the United States Constitution, not by state law" (citing *United States v. Clyburn*, 24 F.3d 613, 616 (4th Cir. 1994))). The Fourth Amendment provides, in pertinent part:

> The right of the people to be secure in their persons . . . against unreasonable . . . seizures . . . shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons . . . to be seized.

U.S. Const., amend. IV. The Warrant Clause of the Fourth Amendment "requires that warrants: (1) be issued by a neutral and detached magistrate, (2) contain a particular description of . . . the persons or things to be seized, and (3) be based upon probable cause, supported by Oath or affirmation." *Hersman*, 2013 WL 1966047, at *3 (citing *Clyburn*, 24 F.3d at 617); *cf. United States v. Dowdell*, 546 F. App'x 128, 131 (4th Cir. 2013) ("A warrant is constitutionally sound when issued by a neutral magistrate and supported by probable cause." (citations omitted)); *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 183–84 (4th Cir. 1996) ("The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an

individual effected without probable cause is unreasonable." (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989))). *See generally Atkins v. City of Chi.*, 631 F.3d 823, 827 (7th Cir. 2011) (Posner, J.) ("Due process requires government to follow reasonable procedures for minimizing mistaken deprivations of liberty."). "This limitation is made applicable to the States through the Fourteenth Amendment." *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) (citing *Wolf v. Colorado*, 338 U.S. 25, 27–28 (1949)).

In the context of Section 1983 claims, the Supreme Court noted that there is "a damages remedy for an arrest following an objectively unreasonable request for a warrant."[5] *Malley v. Briggs*, 475 U.S. 335, 344 (1986); *see, e.g.*, *Messerschmidt*, 132 S. Ct. at 1244 (addressing the applicability of qualified immunity in a case where the plaintiffs "allege[d] that they were subjected to an unreasonable search in violation of the Fourth Amendment because the warrant authorizing the search of their home was not supported by probable cause" and sought "damages

---

[5] The Court notes that Defendants do not challenge whether the Deficient-Affidavit Claims are viable causes of action. (*See, e.g.*, ECF No. 35.) The Court further notes that the Fourth Circuit recently provided the following statement in a case involving Section 1983 claims arising out of allegedly invalid arrest warrants:

> An arrest warrant is invalid only if the officer preparing the affidavit included a false statement with reckless disregard for its truth and, after the statement is redacted, "the affidavit's remaining content is insufficient to establish probable cause." *Franks v. Delaware*, 438 U.S. 154, 156, 98 S. Ct. 2674, 57 L.Ed.2d 667 (1978).

*Cahaly v. Larosa*, Nos. 14–1651, 14–1680, 2015 WL 4646922, at *7 (4th Cir. Aug. 6, 2015). However, the Court finds that this statement from *Cahaly* does not guide its instant analysis regarding Plaintiff's Deficient-Affidavit Claims for two reasons. First, *Cahaly* involved warrant affidavits that established probable cause, even absent any potential false statements. *See id.* In contrast, as discussed below, the Court finds that the First Warrant Affidavit and the Second Warrant Affidavit fail to establish probable cause on their face.

Second, the Supreme Court noted that facially deficient warrant affidavits may constitute a Section 1983 claim in *Malley*. *See* 475 U.S. at 344. As Counts I and II include claims that the Individual Defendants violated Plaintiff's civil rights by submitting facially deficient warrant affidavits that led to his arrest, the Court construes these allegations as claims pursuant to *Malley* and its progeny—even though these claims do not involve allegations of false statements. *Cf. Gash v. Lafayette Cty., Mo.*, No. 12–1157–CV–W–ODS, 2013 WL 3092861, at *3 (W.D. Mo. June 18, 2013) (noting that case law identifies two distinct types of claims arising out of deficient warrants: "(1) warrant applications predicated on falsehoods and (2) warrants that contain true information but that are obviously lacking in probable cause").

20

from [individual officers] for their roles in obtaining and executing this warrant"). *See generally Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1156 (8th Cir. 2014) (noting that "[t]he *Messerschmidt* court . . . affirmed the survival of the standard set forth in [*Malley*]"). Decisions of the Supreme Court "concerning Fourth Amendment probable-cause requirements before a warrant for . . . arrest . . . can issue require that the judicial officer issuing such a warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564 (1971) (citations omitted). "The Fourth Amendment does not require that the basis for probable cause be established in a written affidavit; it merely requires that the information provided the issuing magistrate be supported by 'Oath or affirmation.'" *Clyburn*, 24 F.3d at 617 (quoting U.S. Const., amend. IV). However, if the officer provides only an affidavit as the basis for probable cause, the "affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239 (4th Cir. 1983). "The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." *Maryland v. Garrison*, 480 U.S. 79, 85 (1987).

"In reviewing the propriety of issuing a . . . warrant, the relevant inquiry is whether, under the totality of the circumstances, the issuing judge had a substantial basis for concluding that there was probable cause to issue the warrant." *United States v. Rice*, 325 F. App'x 210, 210 (4th Cir. 2009) (citing *Gates*, 462 U.S. at 238). "[T]he determination and existence of probable cause is a 'practical, nontechnical conception,' and it involves 'factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Gomez v. Atkins*, 296 F.3d 253, 262 (4th Cir. 2002) (quoting *Brinegar v. United States*, 338 U.S. 160, 175–76

21

(1949)). "[I]n determining whether probable cause exists, the evidence 'must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'" *Id.* (quoting *Gates*, 462 U.S. at 232 (1983)).

"Probable cause exists when the facts and circumstances within an officer's knowledge[6]—or of which he possesses reasonably trustworthy information—are sufficient in themselves to convince a person of reasonable caution that an offense has been or is being committed." *Wadkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000) (citing *Brinegar*, 338 U.S. at 175–76). "Probable cause must be supported by more than a mere suspicion, but evidence sufficient to convict is not required." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996) (citing *Wong Sun v. United States*, 371 U.S. 471, 479 (1963)).

"That one is merely present 'at the scene of a crime or in the company of a person engaging in criminal activity' is not, by itself, sufficient to establish probable cause." *Id.* (quoting *United States v. Garcia*, 848 F.2d 58, 60 (4th Cir. 1988)). "Nor is evidence 'of a person's mere propinquity to others independently suspected of criminal activity,' without more, adequate to establish probable cause." *Id.* (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). "Seemingly innocent activity, however, though not conclusive of probable cause, 'may provide the basis for a showing of probable cause' when considered in the context of all of the surrounding circumstances." *Id.* (quoting *United States v. Thomas*, 913 F.2d 1111, 1116 (4th Cir. 1990)).

"[R]easonable law officers need not 'resolve every doubt about a suspect's guilt before

---

[6] The Court notes that the concept of probable cause often includes an analysis of the information "within [the] officer's knowledge" at the relevant time. *See, e.g.*, *Wadkins*, 214 F.3d at 539. However, in the context of establishing the elements of a *Malley* claim, the relevant inquiry is whether the materials provided to a magistrate to procure a warrant—which, in this case, were only the affidavits of the Individual Defendants—support a finding of probable cause. *See, e.g.*, *Malley*, 475 U.S. at 344. As such, when analyzing the elements of Plaintiff's Deficient-Affidavit Claims, the Court looks to the affidavits—and not the Individual Defendants' knowledge—to determine whether the affidavits support a finding of probable cause. *See, e.g.*, *Messerschmidt*, 132 S. Ct. at 1245.

probable cause is established.'" *Gomez*, 296 F.3d at 262 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991)). "While officers 'may not disregard readily available exculpatory evidence . . . the failure to pursue a potentially exculpatory lead is not sufficient to negate probable cause.'" *Id.* (alteration in original) (quoting *Wadkins*, 214 F.3d at 541).

In the context of a warrant obtained by an affidavit, "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and [courts] have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination." *United States v. Leon*, 468 U.S. 897, 914 (1984) (citations omitted); *cf. United States v. Montieth*, 662 F.3d 660, 665 (4th Cir. 2011) ("The requirements for those seeking a warrant are not formulaic but practical, and it is difficult to script *ex ante* the different combinations of facts and circumstances that may or may not support a finding of probable cause." (citations omitted)). "Deference to the magistrate, however, is not boundless." *Leon*, 468 U.S. at 914. "[T]he courts must . . . insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubber stamp for the police." *Id.* (citations omitted). As such, "reviewing courts will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Id.* at 915 (quoting *Gates*, 462 U.S. at 239).

Plaintiff argues that there is no genuine issue of material fact that the First Warrant Affidavit and the Second Warrant Affidavit lack probable cause on their face. (*See, e.g.*, ECF No. 37 at 8–9.) As such, Plaintiff contends that the Individual Defendants violated his civil rights by submitting these affidavits, which then led to his arrest. (*See, e.g.*, *id.* at 2.) The Court addresses, in turn, whether each affidavit passes constitutional muster.

*The First Warrant Affidavit*

The record reflects that Defendant Miller only provided a criminal complaint that included the First Warrant Affidavit—and no additional oath or affirmation—to the magistrate judge to procure the First Warrant. (*See, e.g.*, ECF No. 35 at 2 (constituting Defendants' statement that "[b]ased on Officer Miller's July 16, 2012 sworn criminal complaint, a Kanawha County Magistrate determined there was probable cause to issue warrants for the arrest of Jeremy Hartwell, Jirald Davis and [Plaintiff]"); *cf.* ECF No. 34, Ex. C (Miller Dep.) 53:4–8 (providing the following exchange at Defendant Miller's deposition: "[Q:] At the time that you decided to arrest [Plaintiff], [the First Warrant Affidavit] set forth the facts that you believed that were pertinent to that application for an arrest warrant? [A:] Correct.").) The only facts relating to the alleged offenses in the criminal complaint were presented by Defendant Miller in the First Warrant Affidavit. (*See* ECF No. 34, Ex. A.) As such, the Court shall determine whether the First Warrant Affidavit provides a substantial basis for a probable cause finding. *See, e.g.*, *Leon*, 468 U.S. at 915 ("[R]eviewing courts will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'" (quoting *Gates*, 462 U.S. at 239)).

In the First Warrant Affidavit, Defendant Miller provides the following statement of fact regarding Plaintiff:

> The second incident happened on Tuesday July 10th were [sic] Mr. Hartwell was standing by the same display case. Mr. Hartwell then proceeded towards the MP3 display case around 2114 hours along with suspect #3 [Plaintiff] and Mr. Hartwell enters the case at 2115 hours and Mr. Davis immediately proceeds over to the same location where he begins to talk to [Plaintiff]. At 2116 hours Mr. Hartwell begins to select merchandise (IPods) from the display case concealing them into the right pants pocket and Mr. Davis continues to observe him and distract the other associate from noticing the activity. After concealing the items Mr. Hartwell closes

24

the display case at 2117 hours and Mr. Davis proceeds to walk away towards the electronics register.

. . .

I will be obtaining warrants on all 3 suspects for Embezzlement and Fraudulent Schemes.

(ECF No. 34, Ex. A at 2–3.) The First Warrant Affidavit provides no additional factual assertions regarding Plaintiff. (*See, e.g.*, *id. See generally* ECF No. 97 at 2 (providing Defendants' statement that the First Warrant Affidavit "was in all respects identical to the affidavit that [Defendant Miller] submitted for Hartwell's arrest and a the [sic] magistrate found probable cause existed to issue the warrant").)

The Court finds that the First Warrant Affidavit is a textbook example of an affidavit that utterly fails to provide a probable cause basis to issue a warrant for Plaintiff's arrest. At no point in the First Warrant Affidavit or accompanying materials does Defendant Miller provide any indication, whatsoever, of Plaintiff's involvement in criminal activity. (*See* ECF No. 1, Ex. 1 at 20–21; ECF No. 34, Ex. A at 2–3; *cf.* ECF No. 34, Ex. C (Miller Dep.) 80:11–15 (providing the following exchange at Defendant Miller's deposition: "[Q:] [D]o you agree that, based on what you put down [in the First Warrant Affidavit], based about [sic] your review of the video, that you put down nothing whatsoever that implicates [Plaintiff] in the crime? [A:] Correct.").) *See generally Wadkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000) ("Probable cause exists when the facts and circumstances within an officer's knowledge—or of which he possesses reasonably trustworthy information—are sufficient in themselves *to convince a person of reasonable caution that an offense has been or is being committed*." (emphasis added) (citation omitted)); W. Va. R. Crim. P., Rule 4(a) ("If it appears from the complaint, or from an affidavit or affidavits filed with

25

the complaint, that there is probable cause to believe that an offense has been committed *and that the defendant has committed it*, a warrant for the arrest of the defendant shall issue to any officer authorized by law to execute it." (emphasis added)). Instead, the First Warrant Affidavit provides the exculpatory statement that another Walmart employee—Davis—"distract[ed]" Plaintiff while Hartwell "select[ed] merchandise." (ECF No. 34, Ex. A at 2–3.) Additionally, while the First Warrant Affidavit notes that Plaintiff was present at the scene of the July 10, 2012 theft, Plaintiff's mere presence at the scene of illegal activity, without more, falls far short of constituting probable cause. *See, e.g.*, *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996) ("That one is merely present 'at the scene of a crime or in the company of a person engaging in criminal activity' is not, by itself, sufficient to establish probable cause." (quoting *United States v. Garcia*, 848 F.2d 58, 60 (4th Cir. 1988))); *cf. Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998) ("[W]hen it is considered in the light of all of the surrounding circumstances, even 'seemingly innocent activity' may provide a basis for finding probable cause." (quoting *Taylor*, 81 F.3d at 434)).

Ultimately—considering the totality of circumstances presented to the magistrate judge—the factual assertions in the First Warrant Affidavit are patently insufficient to establish probable cause to issue a warrant for Plaintiff's arrest.[7] Indeed, "even a cursory reading of the [affidavit] in this case—perhaps just a simple glance—would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." *Groh v. Ramirez*, 540 U.S. 551, 564 (2004). As such, the Court shall not defer to the magistrate's apparent rubber

---

[7] The Court notes that "the probable cause inquiry is informed by the elements of the offense" and, as such, courts typically examine the relevant laws the object of a warrant allegedly violated. *Jackson v. Brickey*, 771 F. Supp. 2d 593, 600 (W.D. Va. 2011). However, as both the First Warrant Affidavit and the Second Warrant Affidavit fail to provide any factual assertions regarding Plaintiff's involvement in illegal conduct, the Court finds that an analysis of the elements of the alleged offenses—embezzlement and fraudulent schemes—is unnecessary to determine whether these affidavits provide a constitutional basis for a probable cause finding.

26

stamping of probable cause based on the First Warrant Affidavit. *See, e.g.*, *United States v. Leon*, 468 U.S. 897, 914 (1984) ("[T]he courts must . . . insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubber stamp for the police." (citations omitted)); (*cf.* ECF No. 34, Ex. C (Miller Dep.) 84:8–14 (providing Defendant Miller's testimony that he has "applied for arrest warrants with Kanawha County Magistrates" roughly "700 to 800 times before" he submitted the First Warrant Affidavit and he could not recall a magistrate judge declining to issue a warrant in response to his warrant applications); *id.* 278:22–279:6 (providing the following exchange during Defendant Miller's deposition: "[Q:] [Y]ou've told me . . . you've never had a [m]agistrate not approve your warrant, arrest warrant. [A:] Yeah, I've never had them tell me no and send me away. I've had them make changes in one before, or add words or something, but I've never ever been told no and leave, I've never.").) Instead, the Court finds that the First Warrant Affidavit does not support a finding of provide probable cause on its face. *Cf. Butts v. City of Bowling Green*, 374 F. Supp. 2d 532, 543 (W.D. Ky. 2005) ("[A] bare bones or conclusory affidavit is not sufficient to establish probable cause."). The Court therefore also finds that Defendant Miller infringed on Plaintiff's constitutional rights by submitting the facially deficient First Warrant Affidavit, which then led to Plaintiff's arrest. *See, e.g., Illinois v. Gates*, 462 U.S. 213, 239 (4th Cir. 1983) (stating that an affidavit submitted to procure a warrant "must provide the magistrate with a substantial basis for determining the existence of probable cause").

Accordingly, the Court finds that Plaintiff satisfies the two elements of a Section 1983 claim relating to Defendant Miller's submission of the facially unconstitutional First Warrant Affidavit. *See, e.g., Tincher v. Fink*, No. Civ. A. 2:03-0030, 2005 WL 1845319, at *3 (S.D. W. Va. Aug. 2, 2005) (providing the elements of a Section 1983 claim (citation omitted)).

*The Second Warrant Affidavit*

The record similarly reflects that Defendants Peterson and Moyer only provided a criminal complaint that included the Second Warrant Affidavit—and no additional oath or affirmation—to the magistrate judge to procure the Second Warrant. (*See, e.g.*, ECF No. 35 at 15 ("[T]wo separate, neutral magistrates found probable cause to authorize an arrest warrant [for Plaintiff] based on both [c]riminal [complaints].").) The only facts relating to alleged offenses in the Second Warrant Application were presented by Defendants Peterson and Moyer in the Second Warrant Affidavit. (*See* ECF No. 34, Ex. B.) The Court will therefore determine whether the request for the Second Warrant by Defendants Peterson and Moyer was objectively unreasonable based on the probable cause showing in the Second Warrant Affidavit. *See, e.g.*, *Leon*, 468 U.S. at 915 ("[R]eviewing courts will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'" (quoting *Gates*, 462 U.S. at 239)).

The Second Warrant Affidavit is remarkably similar to the First Warrant Affidavit. (*See* ECF No. 35 at 10 ("As Plaintiff asserts, the criminal complaint submitted under oath by [Defendants] Moyer and Peterson on November 2012 . . . contains some small revisions but is essentially identical to that of the [c]omplaint submitted by [Defendant] Miller."). *Compare* ECF No. 34, Ex. B (the Second Warrant Affidavit) at 2–3, *with* ECF No. 34, Ex. A (the First Warrant Affidavit) at 2–3).) In the Second Warrant Affidavit, Defendants Peterson and Moyer provide the following factual allegations regarding Plaintiff in all capital letters:

> On 10 July 2012 Hartwell was observed on video surveillance by Higginbotham again at the same MP3 display case. Hartwell with [Plaintiff] (co-defendant) present again enters the case selecting and concealing Apple I-Pods into his right pant pocket. Davis again is immediately observed coming to the location, speaking

with [Plaintiff], and appears to distract the other associates from noticing the activity.

. . .

[Plaintiff] is charged with embezzlement and fraudulent schemes.

(ECF No. 34, Ex. B at 2–3.) The Second Warrant Affidavit does not include any additional factual

assertions regarding Plaintiff. (*See* ECF No. 34, Ex. B.)

The Court finds that the Second Warrant Affidavit is also constitutionally deficient on its

face. As with the First Warrant Affidavit, the Second Warrant Affidavit fails to provide any

information as to a fundamental issue in establishing probable cause: how was Plaintiff involved

in any criminal activity? (*See id.* at 2–3.) *See generally Michigan v. DeFillippo*, 443 U.S. 31, 37

(1979) ("[The Supreme Court] repeatedly has explained that 'probable cause' to justify an arrest

means facts and circumstances within the officer's knowledge that are sufficient to warrant a

prudent person, or one of reasonable caution, in believing, in the circumstances shown, *that the*

*suspect has committed, is committing, or is about to commit an offense*." (emphasis added)

(citations omitted)). While the Second Warrant Affidavit removes the exculpatory language

provided in the First Warrant Affidavit, it still fails to indicate how Plaintiff was involved in illegal

conduct. (*See* ECF No. 34, Ex. B at 2–3.) Additionally, the Second Warrant Affidavit again notes

that Plaintiff was present at the scene of the July 10, 2012 theft. (*See id.* at 2.) However, as with

the First Warrant Affidavit, Plaintiff's presence at the scene of illegal activity—without further

factual allegations relating to his involvement in illegal conduct—does not support a finding of

probable cause. *See, e.g.*, *Taylor*, 81 F.3d at 434 ("That one is merely present 'at the scene of a

crime or in the company of a person engaging in criminal activity' is not, by itself, sufficient to

establish probable cause." (quoting *Garcia*, 848 F.2d at 60)).

29

The Court thus finds that the Second Warrant Affidavit is facially deficient insofar as it completely fails to provide any basis for a probable cause finding. The Court therefore shall not defer to the magistrate's patently incorrect determination of probable cause based on the Second Warrant Affidavit. *See, e.g.*, *Leon*, 468 U.S. at 914 ("[T]he courts must . . . insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubber stamp for the police." (citations omitted)). Instead, the Court finds that the Second Warrant Affidavit also fails to establish probable cause. The Court further finds that Defendants Peterson and Moyer infringed on Plaintiff's constitutional rights submitting the facially deficient Second Warrant Affidavit, which then led to Plaintiff's arrest. *See, e.g.*, *Gates*, 462 U.S. at 239 (noting that an affidavit submitted to procure a warrant "must provide the magistrate with a substantial basis for determining the existence of probable cause").

Accordingly, the Court finds that Plaintiff satisfies the two elements of a Section 1983 claim relating to the submission of the facially unconstitutional Second Warrant Affidavit by Defendants Peterson and Moyer. *See, e.g.*, *Tincher v. Fink*, No. Civ. A. 2:03-0030, 2005 WL 1845319, at *3 (S.D. W. Va. Aug. 2, 2005) (providing the elements of a Section 1983 claim (citation omitted)).

2.     Qualified Immunity as to Plaintiff's Deficient-Affidavit Claims

Defendants argue that, regardless of whether the First Warrant Affidavit and the Second Warrant Affidavit are facially deficient, the Individual Defendants are nonetheless entitled to qualified immunity as to the Deficient-Affidavit Claims in Counts I and II. (*See, e.g.*, ECF No. 35 at 4–15; ECF No. 38 at 4–12.) Plaintiff responds that these Defendants are not shielded from liability for these claims because "both warrant applications and supporting affidavits . . . are so

30

lacking in indicia of probable cause that any reasonably well-trained officer would have known that they failed to establish probable cause." (ECF No. 39 at 8 (citation omitted).)

"[C]ourts engage in a two-pronged inquiry" when "resolving questions of qualified immunity at summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014). "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right [.]'" *Id.* (alterations in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). As previously discussed, Plaintiff has shown that the Individual Defendants violated his constitutional rights by seeking warrants based on the facially deficient First Warrant Affidavit and Second Warrant Affidavit. Plaintiff's claims arising out of these deficient affidavits therefore satisfy the first prong of the qualified immunity analysis. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (noting that a plaintiff satisfies the first prong of the qualified immunity analysis if "the facts that a plaintiff has . . . shown (see [Federal Rules of Civil Procedure] 50, 56) make out a violation of a constitutional right" (citation omitted)).

"The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Under the second prong, "'[w]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012). The Supreme Court has repeatedly instructed that arrest warrants must be supported by probable cause and, if an affiant provides only an affidavit in support of this showing, the warrant affidavit must establish probable cause. *See, e.g.*, *Malley v. Briggs*, 475 U.S. 335, 342–46 (1986);

*cf. Miller v. Prince George's Cty., Md.*, 475 F.3d 621, 627 (4th Cir. 2007) ("Unquestionably, '[t]he Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable.'" (quoting *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 183 (4th Cir. 1996))). This tenant of constitutional law flows directly out of the plain language of the Fourth Amendment. *See* U.S. Const., amend. IV ("[N]o warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing . . . the persons or things to be seized."). As such, the Individual Defendants had fair warning that submitting only the defective First Warrant Affidavit and Second Warrant Affidavit in support of the probable cause findings for Plaintiff's arrests was unconstitutional. *Cf. McAfee v. Boczar*, 738 F.3d 81, 87 (4th Cir. 2013) ("By securing a warrant that lacked adequate evidentiary support, [the officer] infringed [the plaintiff's] Fourth Amendment right to be free from capricious arrest. And this constitutional right is clearly established." (citation omitted)). *See generally Tolan*, 134 S. Ct. at 1866 (stating that "'[t]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional'" (alterations in original) (quoting *Hope*, 536 U.S. at 741)); *West v. Murphy*, 771 F.3d 209, 213 (4th Cir. 2014) ("The law is clearly established if 'the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011))).

The remaining query on which this qualified immunity analysis turns is the "objective legal reasonableness" of the Individual Defendants' actions in seeking warrants for Plaintiff's arrest based on these deficient affidavits. *See, e.g.*, *Messerschmidt*, 132 S. Ct. at 1245. "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a

32

neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as [the Supreme Court has] sometimes put it, in 'objective good faith.'" *Messerschmidt*, 132 S. Ct. at 1245 (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984)). "It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable." *Malley*, 475 U.S. at 346 n.9 (citation omitted).

"Nonetheless, . . . the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." *Messerschmidt*, 132 S. Ct. at 1245. Generally, a law enforcement officer "may be entitled to qualified immunity even if the warrants at issue are later determined to have been lacking in probable cause." *Wadkins v. Arnold*, 214 F.3d 535, 539 (2000); *cf. Gomez v. Atkins*, 296 F.3d 253, 261–62 (4th Cir. 2002) ("In [a court's] assessment of whether [the officer defendant] is entitled to qualified immunity, . . . the question is not whether there actually was probable cause for the . . . warrant . . . , but whether an objective law officer could reasonably have believed probable cause to exist." (citing *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991))). However, the Supreme Court has "recognized an exception allowing suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'" [8]

---

[8] The Court notes that the parties disagree on the appropriate standard to apply when considering whether the Individual Defendants are entitled to qualified immunity as to Plaintiff's Deficient-Affidavit Claims. Plaintiff argues that his Deficient-Affidavit Claims implicate the exception to qualified immunity provided in *Malley v. Briggs*, 475 U.S. 335 (1986). (*See, e.g.*, ECF No. 39 at 8.) Defendants, on the other hand, urge the Court to apply the standard provided in *Franks v. Delaware*, 438 U.S. 154 (1978). (*See, e.g.*, ECF No. 35 at 10–15.)

    The Court agrees with Plaintiff's position. As discussed above, Counts I and II allege, in part, that the First Warrant Affidavit and the Second Warrant Affidavit are unconstitutional on their face. (*See* ECF No. 1, Ex. 1 ¶¶ 32

33

*Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (quoting *Malley*, 475 U.S. at 341); *see also Wadkins*, 214 F.3d at 543 ("Admittedly, if a reasonable officer in [the officer defendant's] position should not have applied for the warrants, then [the officer defendant] would not be shielded from liability simply because the [m]agistrate decided to issue them." (citation omitted)). "The 'shield of immunity' otherwise conferred by the warrant will be lost, for example, where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Messerschmidt*, 132 S. Ct. at 1245 (citations omitted). This "obvious" standard in the context of facially-deficient warrants "means error that is apparent from a 'simple glance' at the face of the warrant itself, not a defect that would 'become apparent only upon a close parsing of the warrant application.'" *Armstrong v. Asselin*, 734 F.3d 984, 992 (9th Cir. 2013) (quoting *Messerschmidt*, 132 S. Ct. at 1250).

The Supreme Court noted that this exception is desirable because "an officer who knows

---

& 41.) These allegations clearly implicate the standard provided by the Supreme Court in *Malley*, as well as that case's progeny. *See, e.g.*, *Malley*, 475 U.S. at 341–45.

The standard provided in *Franks*, on the other hand, is a separate and distinct exception to the application of qualified immunity. *See, e.g.*, *Graham v. Gagnon*, Case No. 1:14–cv–872, 2015 WL 2340182, at *4 (E.D. Va. May 6, 2015) (discussing three separate exceptions to the qualified immunity doctrine, such as where (1) "the warrant is facially defective," and (2) "the officer seeking the warrant" provided the magistrate with "material false statements" or omissions of material fact" (citations omitted)); *cf. Gomez*, 296 F.3d at 265–66 (finding that the officer was entitled to the protection of qualified immunity where "[t]he conduct complained of [by the plaintiff] fail[ed] to demonstrate either incompetence or a knowing violation of the law"). The *Franks* standard applies to allegations that an officer is not entitled to qualified immunity due to omissions or false statements in their warrant-application materials. *See, e.g.*, *Miller*, 475 F.3d at 627 (addressing the plaintiff's allegations that "his seizure was unreasonable because it followed from a warrant affidavit that was deficient because it was dishonest" and stating that, "[t]o succeed on his claim, [the plaintiff] must prove that [the officer] deliberately or with a reckless disregard for the truth made material false statements in his affidavit, or omitted from that affidavit material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading" (citations omitted)). However, Plaintiff does not make any such allegation in the Complaint. (*See* ECF No. 1, Ex. 1.) Rather, as Plaintiff notes, Plaintiff's theory of liability is that the Individual Defendants' "true statements" in the First Warrant Affidavit and the Second Warrant Affidavit were facially deficient and "show that [Plaintiff] should not have been charged or arrested." (ECF No. 100 at 5.) The *Franks* standard is thus inapplicable here.

The Court therefore finds that the exception to qualified immunity provided in *Malley* and its progeny is applicable to Plaintiff's Deficient-Affidavit Claims in Counts I and II. The Court further finds that the *Franks* standard is not implicated by these causes of action.

that objectively unreasonable decisions will be actionable may be motivated to reflect, before submitting a request for a warrant, upon whether he has a reasonable basis for believing that his affidavit establishes probable cause." *Malley v. Briggs*, 475 U.S. 335, 343 (1986). The Supreme Court made "clear, however, that the threshold for this exception is a high one." *Messerschmidt*, 132 S. Ct. at 1245; *see also id.* at 1250 (noting that only in "rare" circumstances will it "be appropriate to impose personal liability on a lay officer in the face of judicial approval of his actions"). Indeed, "'[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination' because '[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.'" *Id.* at 1245 (alterations in original) (quoting *Leon*, 468 U.S. at 921). Additionally, an officer "conduct[ing] himself, from a procedural standpoint, in a prudent and deliberate manner" by providing his "proposed affidavit" to his department's legal officer or a prosecutor for review is indicative of objective reasonableness. *Gomez*, 296 F.3d at 264.

*Defendant Miller*

The Court finds that Defendant Miller's submission of the First Warrant Affidavit as the sole basis for the probable cause finding for the First Warrant meets this stringent exception to the doctrine of qualified immunity. As discussed above, the First Warrant Affidavit utterly fails to provide any information as to a fundamental question in the probable cause analysis: what involvement did Plaintiff have in any criminal activity? This deficiency is egregious and patently offends the Constitution. *Cf. Messerschmidt*, 132 S. Ct. at 1245 (noting "an exception allowing suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant

should issue'" (quoting *Malley*, 475 U.S. at 341)).

Defendant Miller testified that, at times, other officers would review warrant applications, or that the magistrate judge would instruct him to add additional information pertaining to probable cause. (*See* ECF No. 34, Ex. C (Miller Dep.) 276:8–22, 278:22–279:7, 280:16–281:2.) However, there is no evidence in the record that anyone other than Defendant Miller reviewed the First Warrant Affidavit, nor that the magistrate judge told Defendant Miller to add additional information to this document. Clearly, in this case, such a review would have been desirable.

Defendant Miller testified that (1) the First Warrant Affidavit was defective because of "typos," (*see* ECF No. 34, Ex. C (Miller Dep.) 74:7–14 (providing Defendant Miller's deposition testimony where he acknowledges that the First Warrant Affidavit contains an exculpatory statement regarding Plaintiff, but asserts that this statement "would have been a typo on [his] part"); *id.* 213:17–21 (constituting Defendant Miller's testimony that the exculpatory statement in the First Warrant Affidavit "was a typo")); (2) "[a] lot of times [he] cop[ies] and paste[s] them and . . . [he] just didn't read over it correctly," (*id.* 77:6–11 (providing Defendant Miller's testimony that, "a lot of times [he] cop[ies] and paste[s] [affidavit applications for warrants] and [he] may - - [he] just didn't read over it correctly"); *cf. id.* 232:3–9 (providing the following exchange during Defendant Miller's deposition: "[Q:] And you agree that . . . had you reread this and gone over it more carefully, you could have done a better job of describing what happened in the video [?] [A:] Correct. [Q:] - - and what you saw? [A:] Correct.")); and (3) that his subjective intent was to include factual assertions in the First Warrant Affidavit regarding how Plaintiff was involved in criminal activity, (*id.* 281:18–282:1 (providing the following exchange during Defendant Miller's deposition: "[Q:] So what happened was, you wanted to say [Plaintiff] did something that

36

suggested he was complicit in a crime and instead you said somebody did something to [Plaintiff] that shows that [Plaintiff] was not complicit in the crime, correct? [A:] Correct.)). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). However, an officer's "subjective beliefs or intentions have no place in our constitutional analysis, which the concerns the objective reasonableness of the officer's conduct in light of the relevant facts and circumstances." *Henry v. Purnell*, 652 F.3d 524, 534 (4th Cir. 2011) (citation omitted); *see also Graham v. Connor*, 490 U.S. 386, 399 (1989) ("The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts . . . have no proper place in that inquiry."); *Henry*, 652 F.3d at 535 (noting that the Fourth Circuit "has consistently conducted an objective analysis of qualified immunity claims and stressed that an officer's subjective intent or beliefs play no role"). In *Henry v. Purnell*, the Fourth Circuit provided the following pertinent discussion:

> In the end, this may be a case where an officer committed a constitutionally unreasonable seizure as the result of an unreasonable factual mistake. If he did, he is no more protected from civil liability than are the well-meaning officers who make unreasonable legal mistakes regarding the constitutionality of their conduct. Although officers are only human and even well-intentioned officers may make unreasonable mistakes on occasion, the doctrine of qualified immunity does not serve to protect them on those occasions.

652 F.3d at 535.

The Court finds that this statement from *Henry* applies with equal force to the instant case. Defendants may claim—as they do here—that the complete lack of any statement in the First Warrant Affidavit regarding how Plaintiff was involved in criminal activity was due to

37

typographical errors or a lack of proofreading. (*See, e.g.*, ECF No. 101 at 4.) However, those purported mistakes and the resulting submission of a warrant application that utterly fails to establish any indicia of probable cause are far from reasonable under any measure of the term. As Defendant Miller's proffered errors in drafting the First Warrant Affidavit were patently not objectively reasonable, the Court finds that those mistakes and his subjective intent do not protect him from civil liability as to Plaintiff's Deficient-Affidavit Claim in Count I. *See, e.g.*, *Henry*, 652 F.3d at 535 ("Although officers are only human and even well-intentioned officers may make unreasonable mistakes on occasion, the doctrine of qualified immunity does not serve to protect them on those occasions.").

In short, the Court finds that the First Warrant Affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. The Court therefore also finds that no reasonably competent officer would have concluded that a warrant should issue based on the First Warrant Affidavit. *See, e.g.*, *Ruiz v. Leb. Cty. Pa.*, Civil No. 1:04-CV-02359, 2007 WL 2907813, at *13 (M.D. Pa. Oct. 3, 2007) ("[I]t is well below the standards of professionalism expected of police officers to issue . . . conclusory affidavits . . . ."); *Butts v. City of Bowling Green*, 374 F. Supp. 2d 532, 544 (W.D. Ky. 2005) ("A bare-bones, conclusory affidavit does not establish probable cause and any reasonably trained officer should have known that he would have to give information about . . . the crime."). As such, the Court finds that Defendant Miller is not shielded from liability for Plaintiff's Deficient-Affidavit Claim in Count I based on the doctrine of qualified immunity. *See, e.g.*, *Tillman v. Coley*, 703 F. Supp. 1571, 1578 (M.D. Ga. 1989) ("[The officer's] preparation of a constitutionally infirm affidavit and his application for a warrant based on thereon preclude the invocation of the qualified immunity

defense.").

The Court thus finds that there is no genuine issue of material fact regarding Plaintiff's Deficient-Affidavit Claim against Defendant Miller in Count I and that Plaintiff is entitled to judgment in his favor on this claim as a matter of law. Accordingly, the Court **GRANTS** Plaintiff's Motion insofar as it requests summary judgment on the Deficient-Affidavit Claim in Count I. The Court also **DENIES** Defendant's Motion insofar as it requests summary judgment on this claim.

*Defendants Peterson and Moyer*

Turning to Defendants Peterson and Moyer, the Court previously found that the Second Warrant Affidavit similarly failed to establish probable cause because it provided absolutely no information as to how Plaintiff was involved in any criminal activity. Again, this deficiency is egregious and patently offends the Constitution. *See, e.g.*, *Illinois v. Gates*, 462 U.S. 213, 239 (1983) ("An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause . . . .").

Defendants again argue that any issues with the probable cause showing in the Second Warrant Affidavit "are in reality the result of innocent and commonly made typographical errors on the part of Officer Miller that were perpetuated upon the refiling of the criminal complaint by Officers Moyer and Peterson." (ECF No. 97 at 10–11.) As discussed above, the Court finds that any errors purportedly made by Defendant Miller in drafting the First Warrant Affidavit are not objectively reasonable. *Cf. Henry*, 652 F.3d at 535 ("Although officers are only human and even well-intentioned officers may make unreasonable mistakes on occasion, the doctrine of qualified immunity does not serve to protect them on those occasions."). The Court therefore finds that the perpetuation of these errors by the apparent copying-and-pasting of this constitutionally deficient

39

language by Defendants Peterson and Moyer in the Second Warrant Affidavit is similarly not objectively reasonable.

However, this qualified immunity analysis differs from Defendant Miller's situation in one important way—the record indicates that Defendants Peterson and Moyer consulted with a prosecutor before arresting Plaintiff.[9] (*See, e.g.*, ECF No. 34, Ex. E at 117.) *See generally Gomez v. Atkins*, 296 F.3d 253, 264 (4th Cir. 2002) (stating that whether an officer "conducted himself, from a procedural standpoint, in a prudent and deliberate manner" is "important" to a court's "assessment of objective reasonableness"). The Fourth Circuit has repeatedly noted "[t]he most obvious possibility [of exceptional circumstances supporting qualified immunity despite the violation of a clearly established constitutional right] is mistaken official advice by legal counsel." *Wadkins v. Arnold*, 214 F.3d 535, 542 (4th Cir. 2000) (quoting *Pritchett v. Alford*, 973 F.2d 307, 316 (4th Cir. 1992)). Nonetheless, the "approval of the criminal charge" by both a prosecutor and magistrate judge "d[oes] not mandate a grant of qualified immunity." *Merchant v. Bauer*, 677 F.3d 656, 664 (4th Cir. 2012) (citation omitted). Rather, evidence that an officer undertook these steps "weigh[s] heavily *toward* a finding that [an officer] is immune," *Wadkins*, 214 F.3d at 541, and "need only 'appropriately be taken into account in assessing the reasonableness of [the officer's] actions,'" *Bauer*, 677 F.3d at 664 (quoting *Wadkins*, 214 F.3d at 542). Examples of where the import of such procedures is vitiated, to some extent, include where (1) the officer "discovered information tending to exonerate [the criminal defendant] but nevertheless pursued the charge against her," *id.* at 665; (2) "the officer 'provided misleading information to the [state's] attorney,'"

---

[9] The record indicates that Defendants Peterson and Moyer consulted with one of two prosecutors by telephone before submitting the Second Warrant Application—"Assistant Prosecuting Attorney Joey Spano or Assistant Prosecuting Attorney Reagan Whitmyer." (ECF No. 34, Ex. E at 117.)

*Martin v. Conner*, 882 F. Supp. 2d 820, 843 (D. Md. 2012) (quoting *Wadkins*, 214 F.3d at 541–42); *see also Merchant v. Fairfax Cty., Va.*, 778 F. Supp. 2d 636, 648 (E.D. Va. 2011) ("An officer cannot provide a prosecutor with a hand-picked cluster of facts, ask the attorney's general impression of the case, and thereby relieve himself of his responsibility to exercise professional competence."); or (3) "probable cause was plainly lacking," *McKinney v. Richland Cty. Sheriff's Dep't*, 431 F.3d 415, 419 (4th Cir. 2005) (citation omitted); *see also id.* ("Both a prosecutor and a neutral and detached magistrate independently reviewed the evidence and concluded that there was probable cause. A reasonable officer would not second-guess these determinations unless probable cause was plainly lacking . . . .").

While the record clearly indicates that Defendants Peterson and Moyer consulted with a prosecutor before arresting Plaintiff, (*see, e.g.*, ECF No. 34, Ex. E (Peterson Dep.) 160:10–161:8), the import of these procedures in the instant qualified immunity analysis is not apparent from the record for two reasons. First, there is contradictory evidence in the record as to whether Defendants Peterson and Moyer read the entire file to the prosecutor, (*see* ECF No. 34, Ex. D (Moyer Dep.) 24:1–11 (providing Defendant Moyer's deposition testimony that, when discussing the case with "the Prosecutor's Office," he and Defendant Peterson "read the file, gave them what we had on it, advised them this was an embezzlement case, there was supposedly three individuals involved in it, that there was a statement from the individual that had pled, and - - against the other two co-defendants, and that there was video also")), or merely provided a summary of the facts of the case, (*see, e.g.*, ECF No. 34, Ex. E at 117 (providing the following interrogatory response from Defendants: "Sometime after Paul Higginbotham requested that [Defendants] Moyer and Peterson re-file the charges against [Plaintiff] and before November 7, 2012, [Defendants] Moyer and

41

Peterson spoke with either Assistant Prosecuting Attorney Joey Spano or Assistant Prosecuting Attorney Reagan Whitmyer by telephone and *provided a summary of the case* and were told to re-file the charges" (emphasis added)). If these Defendants did not gain the approval of the prosecutor regarding the language of the Second Warrant Affidavit, then they did not receive a legal opinion as to the sufficiency of the probable cause allegations in that document. *Cf. Messerschmidt v. Millender*, 132 S. Ct. 1235, 1250 (2012) ("Indeed, . . . the officers here did not merely submit their application to a magistrate. They also presented it for review by a superior officer, and a deputy district attorney, before submitting it to the magistrate. The fact that none of the officials who reviewed the application expressed concern about its validity demonstrates that any error was not obvious."). Under such circumstances, these procedures would not constitute a factor weighing in favor of a finding that Defendants Peterson and Moyer acted in an objectively reasonable manner in submitting the Second Warrant Affidavit to obtain the Second Warrant. *See, e.g.*, *Wadkins*, 214 F.3d at 541–42.

Second, Defendant Peterson unambiguously testified that he and Defendant Moyer consulted with a prosecutor *before* drafting the Second Warrant Affidavit, (ECF No. 34, Ex. E (Peterson Dep.) 160:10–161:8). As such, under normal circumstances, that prosecutor could not review the language of the Second Warrant Affidavit and provide an educated opinion as to whether it supported a probable cause finding. *Cf. Gomez*, 296 F.3d at 264 (finding that the procedures the officer defendant followed weighed in favor of qualified immunity where, in part, the officer "provided his proposed affidavit to the [d]epartment's legal advisor for her review" prior to seeking "the issuance of a . . . warrant"). However, this case presents a unique fact pattern on this point. As previously noted, the language of the Second Warrant Affidavit is virtually

identical to the language of the First Warrant Affidavit. (*Compare* ECF No. 34, Ex. A (the First Warrant Affidavit) at 2–3, *with id.*, Ex. B (the Second Warrant Affidavit) at 2–3.) Indeed, the primary material difference between these documents' factual assertions relating to Plaintiff is that the First Warrant Affidavit provides an exculpatory statement, (*id.*, Ex. A at 2–3 ("At 2116 hours Mr. Hartwell begins to select merchandise (IPods) from the display case concealing them into the right pants pocket and Mr. Davis continues to observe him and *distract the other associate from noticing the activity*." (emphasis added)), while Defendants Peterson and Moyer adjusted this statement in the Second Warrant Affidavit to make it non-exculpatory, (*see id.*, Ex. B at 2 ("Davis again is immediately observed coming to the location, speaking with [Plaintiff], and appears to distract the other associates from noticing the activity.")). As such, the procedure of Detectives Peterson and Moyer consulting with a prosecutor may be indicative of objective reasonableness if these Defendants showed (or read) the full First Warrant Affidavit to that prosecutor and received an opinion that the language pertaining to Plaintiff was sufficient to support a finding of probable cause. *See, e.g.*, *Gomez*, 296 F.3d at 264.

The Court finds that there are genuine issues of material fact as to these issues.[10] As such, the Court cannot make a determination as to the weight, if any, to accord to Defendant Peterson and Moyer consulting with a prosecutor prior to seeking the Second Warrant based on the Second

---

[10] As noted above, the procedure of gaining a legal opinion does not factor in favor of an objective-reasonableness finding if the officer discovered exculpatory information regarding an individual, "but nevertheless pursued the charge against her." *Bauer*, 677 F.3d at 665. The First Warrant Affidavit provides an exculpatory statement regarding Plaintiff, (*see, e.g.*, ECF No. 34, Ex. A at 2–3), while Defendants Peterson and Moyer adjusted this language in the Second Warrant Affidavit to be non-exculpatory, (*see, e.g.*, *id.*, Ex. B at 2). However, Plaintiff clearly states that he does not allege that Defendants Peterson and Moyer omitted information or provided false statements in the Second Warrant Affidavit. (*See, e.g.*, ECF No. 100 at 5.) Rather, Plaintiff maintains that the Individual Defendants' factual statements in the two affidavits were not "errors at all, but true statements that show that [Plaintiff] should not have been charged or arrested." (*Id.*) As Plaintiff clearly avoids any allegation that Defendants Peterson and Moyer ignored exculpatory information, the Court does not address this issue in the instant qualified immunity analysis.

Warrant Affidavit. Instead, these factual determinations are properly left to the fact finder. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (stating that, "under either prong" of the qualified immunity analysis, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment" (citations omitted)); *cf. Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005) (holding "that the legal question of a defendant's entitlement to qualified immunity *under a particular set of facts* should be decided by the court, not by the jury").

The Court recognizes that the Fourth Circuit emphasized "the importance of resolving the question of qualified immunity at the summary judgment stage rather than at trial." *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003) (citations omitted). Nonetheless, the Fourth Circuit "also recognized that the qualified immunity question can be difficult for a court to resolve as a matter of law, as it can at times requires 'factual determinations respecting disputed aspects of [a defendant's] conduct.'" *Id.* (alteration in original) (quoting *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992)). This case presents such unresolved factual determinations. As such, based on the above analysis, the Court finds that there are genuine issues of material fact relating to whether Defendants Peterson and Moyer have qualified immunity as to Plaintiff's Deficient-Affidavit Claim against these Defendants. Of course, "[b]ecause the disputed facts, if resolved in favor of [the Defendants], might lead a reasonable jury to conclude that [they are] entitled to qualified immunity, the qualified immunity defense remains available to [Defendants Peterson and Moyer] at trial." *Merchant v. Bauer*, 677 F.3d 656, 660 n.3 (4th Cir. 2012) (quoting *Merchant v. Fairfax Cty., Va.*, 778 F. Supp. 2d 636, 649 n.14 (E.D. Va. 2011)). However, at this stage in the litigation, the Court finds that neither party is entitled to summary judgment on this claim.

Accordingly, the Court **DENIES** both Plaintiff's Motion and Defendant's Motion insofar

as they request summary judgment on Plaintiff's Deficient-Affidavit Claim in Count II.

## C.   Counts I and II—Section 1983 Malicious Prosecution Claims Against the Individual Defendants

Counts I and II also include claims that the Individual Defendants "arrested Plaintiff . . . without probable cause and deprived him of liberty without due process in violation of the United States Constitution and the West Virginia Constitution." (ECF No. 1, Ex. 1 ¶¶ 33 & 44.) Defendants request summary judgment on these Section 1983 Malicious Prosecution Claims on the grounds that (1) the Individual Defendants had probable cause to arrest Plaintiff; and (2) the Individual Defendants are shielded from liability for these claims by the doctrine of qualified immunity. (*See, e.g.*, ECF No. 35 at 4–15.) The Court again addresses, in turn, whether (1) Plaintiff shows the elements of these Section 1983 claims, and (2) the doctrine of qualified immunity shields the Individual Defendants from liability for these causes of action.

### 1.   The Elements of the Section 1983 Malicious Prosecution Claims

"To maintain a § 1983 action, [a plaintiff] must show that: (1) he has been deprived of a right secured by the Constitution and the laws of the United States, and (2) that the defendants deprived him of this right while acting under 'color of any [law].'" *Tincher v. Fink*, No. Civ. A. 2:03-0030, 2005 WL 1845319, at *3 (S.D. W. Va. Aug. 2, 2005) (second alteration in original) (citation omitted). The record reflects—and neither party otherwise contests—that the Individual Defendants acted in their capacity as law enforcement officers when they arrested Plaintiff pursuant to warrants. (*See, e.g.*, ECF No. 35 at 2–3.) The Court therefore finds that the Individual Defendants were acting under color of law at the time of the arrests. *See, e.g.*, *Brown v. Winders*, No. 5:11–CV–176–FL, 2011 WL 4828840, at *3 (E.D.N.C. Oct. 11, 2011) ("Acts performed by a police officer in his or her capacity as an officer, even if illegal or not authorized by state law, are

considered to have been taken under color of law." (citing *Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978))).

The remaining Section 1983 element to consider for these claims is whether the Individual Defendants deprived Plaintiff of a constitutional right when they arrested him pursuant to warrants. *See, e.g.*, *Tincher*, 2005 WL 1845319, at *3 (providing the elements of a Section 1983 claim). Plaintiff's Section 1983 Malicious Prosecution Claims in Counts I and II allege violations of the Fourth and Fourteenth Amendments of the Constitution. "The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 183 (4th Cir. 1996) (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)); *see also Atkins v. City of Chi.*, 631 F.3d 823, 827 (7th Cir. 2011) (Posner, J.) ("Due process requires government to follow reasonable procedures for minimizing mistaken deprivations of liberty.").

"[A]llegations that an arrest made pursuant to a warrant was not supported by probable cause, or claims seeking damages for the period after legal process issued, are analogous to the common-law tort of malicious prosecution."[11] *Brooks*, 85 F.3d at 182 (citations omitted); *see also Massey v. Ojaniit*, 759 F.3d 343, 356 (4th Cir. 2014) (stating that a Section 1983 claim that "alleges malicious prosecution and unreasonable seizure . . . is properly 'founded on a Fourth Amendment

---

[11] In their supplemental briefing, Defendants argue that the Fourth Circuit's opinion in *Snider v. Lee* "seems to indicate that a claim for common law malicious prosecution and a claim for Fourth Amendment improper seizure . . . are one and the same." (ECF No. 97 at 9 (citing 584 F.3d 193, 199 (4th Cir. 2009)).) Defendants do not provide any additional argument to provide context to this assertion. (*See id.*) Nonetheless, insofar as Defendants' argument may be interpreted as an assertion that Fourth Amendment seizure and common-law malicious prosecution claims are identical, this assertion is mistaken. *See, e.g.*, *Burrell v. Virginia*, 395 F.3d 508, 514 (4th Cir. 2005) ("Although malice is required to state a claim for malicious prosecution at common law, the reasonableness of a seizure under the Fourth Amendment should be analyzed objectively." (citing *Brooks*, 85 F.3d at 184 n.5)).

seizure that incorporates elements of the analogous common law tort of malicious prosecution'" (quoting *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000))). A malicious prosecution claim under Section 1983 "require[s] that [1] the defendant[s] have seized [the] plaintiff pursuant to legal process that was not supported by probable cause[;] and [2] that the criminal proceedings have terminated in [the] plaintiff's favor."[12] *Massey*, 759 F.3d at 356 (quoting *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012)); *see also Miller v. Prince George's Cty., Md.*, 475 F.3d 621, 627 (4th Cir. 2007) ("A plaintiff's allegations that police seized him 'pursuant to legal process that was not supported by probable cause and that the criminal proceedings terminated in his favor are sufficient to state a . . . claim alleging a seizure that was violative of the Fourth Amendment.'" (alteration in original) (quoting *Brooks*, 85 F.3d at 183–84)); *cf. Evans v. Chalmers*, 703 F.3d 636, 647–48 (4th Cir. 2012) (discussing the causation requirement of a Section 1983 malicious prosecution claim). Defendants do not contest—and the record otherwise reflects—that the criminal proceedings terminated in Plaintiff's favor or that the Individual Defendants seized (i.e. arrested) Plaintiff. (*See, e.g.*, ECF No. 97 at 2–4; ECF No. 39 at 5–6.) "Given that [Defendants] have only focused on the element of probable cause, the Court will do the same." *Smith v. Munday*, Civil Action No. 5:12–CV–202, 2014 WL 7341196, at *3 (W.D.N.C. Dec. 23, 2014).

"In assessing the existence of probable cause, courts examine the totality of the circumstances known to the officer at the time of the arrest." *Taylor v. Waters*, 81 F.3d 429, 434

---

[12] In their briefing relating to Defendants' Motion, Defendants argue that the prosecutor's decision in the first probable cause hearing to only call one witness insulates the Individual Defendants from liability. (*See* ECF No. 42 at 12–13; ECF No. 101 at 7–8.) The precise nature of this argument is unclear, as Defendants argue in one instance that it applies to Plaintiff's common-law malicious prosecution claims, (*see* ECF No. 42 at 12–13), and in another to Plaintiff's Section 1983 Malicious Prosecution Claim, (*see* ECF No. 101 at 7–8). The Court is not persuaded by Defendants' argument, as this case does not involve an intervening actor, such as a prosecutor's decision to seek an indictment. *Cf. Evans v. Chalmers*, 703 F.3d 636, 648 (4th Cir. 2012) (discussing situations where a police officer may not be liable for a malicious-prosecution claim "following indictment")).

(4th Cir. 1996) (citation omitted). "Probable cause is an objective standard of probability, justifying arrest when 'facts and circumstances . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Jackson v. Brickey*, 771 F. Supp. 2d 593, 599 (W.D. Va. 2011) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." *Brown v. Gilmore*, 278 F.3d 362, 368 (4th Cir. 2002) (citing *Wong Sun v. United States*, 371 U.S. 471, 479 (1963)). "Indeed, it is irrelevant to the probable cause analysis what crime a suspect is eventually charged with, or whether a person is later acquitted of the crime for which she or he was arrested." *Sennett v. United States*, 667 F.3d 531, 535–36 (4th Cir. 2012) (citations omitted). "[A]n officer is not required to 'exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established.'" *Miller*, 475 F.3d at 630 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991)). "Determining whether the information surrounding an arrest suffices to establish probable cause is an individualized and fact-specific inquiry." *Wadkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000) (citing *Wong Sun*, 371 U.S. at 479).

"Two factors govern the determination of probable cause in any situation: 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'" *Gilmore*, 278 F.3d at 368 (quoting *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992)). "Therefore, probable cause 'could be lacking in a given case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both.'" *Id.* (quoting *Pritchett*, 973 F.2d at 314).

48

Defendants argue that the Individual Defendants had probable cause at the time of the respective arrests. (*See, e.g.*, ECF No. 35 at 5–9, 13–15.) The Court therefore analyzes the probable cause for each of Plaintiff's arrests.

*Defendant Miller*

Defendants argue that Defendant Miller had probable cause to arrest Plaintiff based on the following evidence: (1) Defendant Miller's review of the surveillance video capturing the second theft; (2) the statement of an employee of the victim—the Walmart APM—that Plaintiff was involved in the theft; (3) the Hartwell Statement; (4) the arrests and statements of Jirald Davis; (5) and Defendant Miller's act in locating seven of the iPods at a pawn shop. (ECF No. 101 at 4.) Plaintiff argues that there are genuine issues of material fact relating to all of this evidence and, correspondingly, to whether Defendant Miller had probable cause to arrest Plaintiff. (*See, e.g.*, ECF No. 39 at 9.) The Court agrees with Plaintiff's position.

First, Defendants argue that Defendant Miller's interpretation of the surveillance video of the second theft supports a finding of probable cause. (*See* ECF No. 101 at 4 (stating that Defendant Miller "reviewed the surveillance videotape with [the Walmart APM]"); *see also* ECF No. 34, Ex. C (Miller Dep.) 35:11–15 (providing the following testimony by Defendant Miller regarding his interpretation of the surveillance videos: "That they were all three - - the first video showed the two, Jirald Davis and Mr. Hartwell, working and conspiring together in concert taking the iPods, then the second video showed [Plaintiff] and the other two in concert with taking the iPods").) However, Defendant Miller provided a contradictory statement in the First Warrant Affidavit, in which he does not indicate that Plaintiff was involved in any criminal activity. (*See* ECF No. 34, Ex. A at 2–3.) Instead, the First Warrant Affidavit provides an exculpatory statement indicating

49

that Plaintiff was not acting in concert with the other individuals. (*See id.*) As such, the First Warrant Affidavit casts serious doubt on whether Defendant Miller's interpretation of the video at the time of Plaintiff's arrest supports a probable cause determination. *Cf. Gilmore*, 278 F.3d at 368 (noting that "the suspect's conduct as known to the officer" is a "factor[] govern[ing] the determination of probable cause" (citation omitted)).

Second, Defendants note that a representative of the victim—the Walmart APM—provided a statement to Defendant Miller that Plaintiff acted in concert with the other two individuals to commit the theft. (*See* ECF No. 101 at 4.) Again, however, the record indicates that the sole basis for the Walmart APM's statement implicating Plaintiff was the Walmart APM's review of the surveillance videos. (*See, e.g.*, ECF No. 100, Ex. 6 at 5 (providing the Walmart APM's statement in the Walmart Internal Report).) Defendant Miller, himself, provided a contradictory interpretation of the surveillance video in the First Warrant Affidavit. (*See* ECF No. 34, Ex. A at 2–3.)

Additionally, Plaintiff argues that Defendant Miller received Walmart's internal documentation regarding the alleged thefts "around the time Walmart reported the incident." (ECF No. 100 at 5.) Plaintiff further notes that the Walmart Internal Report states that only Hartwell and Davis were involved in the thefts, (*see id.* at 6; *see also id.*, Ex. 6 at 2–3 (providing handwritten notes that describe Hartwell as the "Main Guy" and Davis as "Suspect #2")), and includes a narrative description of the second theft—written by the Walmart APM and dated July 13, 2012—that indicates Plaintiff was not involved in the thefts, (*see id.*, Ex. 6 at 5). Plaintiff fails, however, to point to a specific part of the record providing that Defendant Miller had access to this statement at the time of Plaintiff's arrest. (*See, e.g.*, ECF No. 100 at 5–7.)

50

Nonetheless, as Plaintiff states, the Walmart APM's narrative description of the second theft—and particularly Plaintiff's lack of involvement in the criminal activity—in the Walmart Internal Report is remarkably similar to Defendant Miller's description in the First Warrant Affidavit, including the exculpatory statement. (*Compare* ECF No. 100, Ex. 6 at 5 (providing the Walmart APM's narrative in the Walmart Internal Report), *with* ECF No. 34, Ex. A at 2–3 (constituting the First Warrant Affidavit).) As such, there is a question of fact as to whether Defendant Miller read the Walmart Internal Report before he arrested Plaintiff. If Defendant Miller did read the Walmart Internal Report, he would be aware that the Walmart APM provided a contradictory and exculpatory statement regarding Plaintiff in this report, thereby impacting the veracity of the Walmart APM's purported interpretation of the surveillance videos.

Third, Defendants argue that the Hartwell Statement provides additional evidence supporting Defendant Miller's probable cause determination at the time of the arrest. (*See* ECF No. 97 at 11.) In particular, Defendants assert that Defendant "Miller . . . arrested Hartwell on July 18, 2012" and "[d]uring the course of the questioning, Hartwell admitted that Jirald Davis and Plaintiff . . . participated in the theft of the iPods and provided a signed written statement to that effect." (*Id.* at 2; *cf.* ECF No. 34, Ex. C (Miller Dep.) 116:15–18 (providing the following exchange during Defendant Miller's deposition: "[Q:] Do you know what date [the Hartwell] statement was taken? [A:] It would have been the same date as his arrest, the same date his Mirandas were read to him.").)

However, the record is far from clear as to whether Defendant Miller had knowledge of the Hartwell Statement at the time he arrested Plaintiff. The Hartwell Statement is conspicuously not dated. (*See* ECF No. 34, Ex. G (the Hartwell Statement); *id.*, Ex. C (Miller Dep.) 116:13–14

(providing Defendant Miller's testimony that the Hartwell Statement was not dated due to his "mistake").) Additionally, the First Warrant Affidavit does not reference this presumably relevant corroborating statement. (*See* ECF No. 34, Ex. A at 2–3.) Defendant Miller also testified repeatedly that he obtained the Hartwell Statement "after [he] had already obtained all three warrants." (*Id.*, Ex. C (Miller Dep.) 55:1–4; *see also id.* 54:10–55:22 (providing Defendant Miller's testimony where he repeatedly indicates that he did not have possession of the Hartwell Statement when he submitted the First Warrant Affidavit).) As such, the record is entirely unclear as to whether Defendant Miller possessed knowledge of the Hartwell Statement when he arrested Plaintiff.

Fourth, Defendants argue that the arrest and statements of an individual involved in the thefts—Davis—indicate that Defendant Miller reasonably believed he had probable cause to arrest Plaintiff at the time of the arrest. (*See* ECF No. 101 at 4.) However, Defendants fail to point to any evidence in the record indicating that Davis implicated Plaintiff in this theft. (*See, e.g.*, *id.*) Absent such evidence, the arrest and statements of Davis are immaterial to the instant analysis.

Finally, Defendants note that Defendant Miller recovered "at least 7 of the iPods at a pawn shop." (*Id.*) Again, Defendants fail to direct the Court to any evidence in the record connecting the fact that Defendant Miller located these iPods to Plaintiff's involvement in any criminal activity. (*See, e.g.*, *id.*) As such, this evidence is similarly immaterial here.

The Court finds that the above pervasive discrepancies in the record constitute a genuine issue of material fact as to what Defendant Miller knew at the time he arrested Plaintiff. Absent such information, it is impossible to determine whether Defendant Miller had probable cause to arrest Plaintiff. The Court thus finds that there are genuine issues of material fact as to whether Plaintiff can show the elements of the Section 1983 Malicious Prosecution Claim in Count I.

52

*Defendants Peterson and Moyer*

Defendants next argue that they are entitled to summary judgment as to Plaintiff's Section 1983 Malicious Prosecution Claim against Defendants Peterson and Moyer in Count II. (*See, e.g.*, ECF No. 101 at 4–6.) Defendants assert that the following indicates Defendants Peterson and Moyer had probable cause at the time of this arrest: (1) they reviewed "the investigation file" created by Defendant Miller, (*id.* at 5); (2) they "watched the [surveillance] video a second time," (*id.*); (3) they reviewed the criminal complaint and supporting affidavit;" (ECF No. 35 at 14); (4) they reviewed the Hartwell Statement, (*id.*); and (5) they reviewed "the report filed by Walmart" and "the property receipts," (*id.*). Plaintiff argues that there are material issues of fact as to whether this investigation yielded probable cause. (*See, e.g.*, ECF No. 100 at 7–8.) The Court addresses each part of the investigation purportedly performed by Defendants Peterson and Moyer in sequence.

First, Defendants argue that Defendants Peterson and Moyer reviewed "the investigation file." (ECF No. 101 at 5) There is only one such file in the record—the "South Charleston Police Department Incident Report." (ECF No. 34, Ex. F.) This report includes five narrative statements, four of which reference Plaintiff: (1) the narrative portion of the First Warrant Affidavit; (2) a follow-up statement by Defendant Miller regarding a statement made by Hartwell—which does *not* reference Plaintiff, in any way; (3) a note that Plaintiff "turned himself in on a felony warrant;" and (4) a narrative provided by Defendants Peterson and Moyer regarding their investigation. (*See id.* at 6–10.) This narrative by Defendants Peterson and Moyer provides the following, in its entirety:

> On 28 November 2012 Detectives met with [Plaintiff] & Jirald Azeem Davis (suspects) at the Kanawha County Court House located at 111 Court St Charleston,

53

Kanawha County WV in reference [to] warrant service. Davis and [Plaintiff] met with Detectives in regards [to] a case that had been re-filed in Kanawha County Magistrate Court.

Davis and [Plaintiff] were arraigned on one count each of embezzlement and one count each of fraudulent schemes warrant numbers 12F-3079,80,81,82. Both suspects were issued a PR bond and released from that point.

A copy of the criminal complaints, criminal case history sheets and the CDR's are attached to this supplement.

Cleared by arrest x 2.

Nothing further.

(*Id.* at 10.)

None of the narratives in this file provide any information, whatsoever, as to Plaintiff's involvement in criminal activity. (*See id.* at 6–10.) As discussed above, the First Warrant Affidavit is utterly devoid of any indication of probable cause. While the narrative provided by Defendants Peterson and Moyer indicates that they met with Plaintiff on November 28, 2012, it does not state whether that conversation resulted in these Defendants gaining information indicative of probable cause. (*See id.* at 10.) As such, the review of this file by Defendants Peterson and Moyer does not support a probable cause finding.

Second, Defendants note that Defendants Peterson and Moyer reviewed the surveillance video, which they purportedly interpreted as showing Plaintiff's involvement in criminal activity. (*See, e.g.*, ECF No. 101 at 5.) However, Defendants Peterson and Moyer provided contradictory evidence on this point when they submitted the Second Warrant Affidavit, which fails to provide any indication of probable cause. (*See* ECF No. 34, Ex. B at 2–3.)

Third, Defendants argue that Defendants Peterson and Moyer reviewed the Hartwell Statement before arresting Plaintiff. (*See* ECF No. 35 at 14.) Again, the record is not clear on this point. Defendants Peterson and Moyer did not include any reference to the Hartwell Statement in

54

the Second Warrant Affidavit. (*See* ECF No. 34, Ex. B at 2–3.) Additionally, they omitted any reference to the Hartwell Statement in their narrative in the police file regarding these incidents. These omissions of a potentially highly relevant piece of information are telling and raise the question as to whether these Defendants viewed the Hartwell Statement prior to the arresting Plaintiff.

Finally, Defendants assert that Defendants Peterson and Moyer reviewed the report filed by Walmart and property receipts. (*See* ECF No. 35 at 14.) Again, however, there is no evidence in the record pertaining to these documents that would indicate they include evidence relevant to the instant probable cause analysis regarding Plaintiff. (*See, e.g.*, ECF No. 100, Ex. 6 (the Walmart Internal Report).)

In short, the evidence in the record pertaining to the knowledge of Defendants Peterson and Moyer at the time they arrested Plaintiff includes pervasive and widespread material questions of fact. The credibility determinations pertaining to these discrepancies are properly left to a jury, not the Court. As such, the Court finds that there are genuine issues of material fact as to whether Plaintiff can show the elements of his Section 1983 Malicious Prosecution Claim in Count II.

2. <u>Qualified Immunity as to Plaintiff's Section 1983 Malicious Prosecution Claims</u>

Defendants argue that—regardless of whether Plaintiff establishes a violation of constitutional rights—the Individual Defendants are shielded from liability for Plaintiff's Section 1983 Malicious Prosecution Claims in Counts I and II by the doctrine of qualified immunity. (*See, e.g.*, ECF No. 35 at 4–15.)

As discussed above, "courts engage in a two-pronged inquiry" when "resolving questions of qualified immunity at summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014). "The

first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right [.]'" *Id.* (alterations in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court previously found that there are substantial and pervasive discrepancies in the record as to the Individual Defendants' knowledge at the time of Plaintiff's arrests, and that there are corresponding genuine issues of material fact as to whether these Defendants had probable cause for these arrests. The Court therefore finds that there are also genuine issues of material fact as to whether the Individual Defendants' conduct in arresting Plaintiff violated a federal right.

"The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Under the second prong, "'[w]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012). "Thus, in the instant case, even if [the Individual Defendants] actually lacked probable cause to arrest plaintiff . . . , they may nonetheless be entitled to qualified immunity if their belief that there was probable cause was objectively reasonable." *Graham v. Gagnon*, Case No. 1:14–cv–872, 2015 WL 2340182, at *3 (E.D. Va. May 6, 2015).

"Unquestionably, '[t]he Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable.'" *Miller v. Prince George's Cty., Md.*, 475 F.3d 621, 627 (4th Cir. 2007) (quoting *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 183 (4th Cir. 1996)). Furthermore, it has long

been established "[t]hat one merely present 'at the scene of a crime or in the company of a person engaging in criminal activity' is not, by itself, sufficient to establish probable cause." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996) (quoting *United States v. Garcia*, 848 F.2d 58, 60 (4th Cir. 1988)). The Individual Defendants thus had fair warning that arresting an individual who was present at the scene of criminal activity, but without further indicia of probable cause, is unconstitutional and, correspondingly, that this right is clearly established. *See, e.g.*, *id.*; *cf. West v. Murphy*, 771 F.3d 209, 213 (4th Cir. 2014) ("The law is clearly established if 'the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011))).

The remaining question on which this qualified immunity analysis turns is the "objective legal reasonableness" of the Individual Defendants' actions in arresting Plaintiff. *See, e.g.*, *Messerschmidt*, 132 S. Ct. at 1235. "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as [the Supreme Court has] sometimes put it, in 'objective good faith.'" *Messerschmidt*, 132 S. Ct. at 1245 (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984)); *see also Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991) ("[T]he magistrate's determination of probable cause provide[s] additional support for [the officer's] claim that he acted with objective reasonableness. (citation omitted)). "Nonetheless, . . . the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." *Messerschmidt*, 132 S. Ct. at 1245. One situation where defendants will not be protected by the shield of qualified immunity when executing a warrant is "if, on an objective

57

basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Graham*, 2015 WL 2340182, at *4 (stating that "an officer making an arrest pursuant to a warrant is deemed to have acted in an objectively reasonable manner unless," among other things, "'the magistrate so obviously erred that any reasonable officer would have recognized the error'" (quoting *Messerschmidt*, 132 S. Ct. at 1250)). As the Fourth Circuit noted, "[i]f a person is arrested when no reasonable officer could believe, in light of the contours of the offense at issue, that probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment right to be arrested only upon probable cause ensues." *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001) (citing *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996)). "Thus, the appropriate question is whether a reasonable police officer could have believed that arresting [the person] on [the alleged charges] was lawful, in light of clearly established law and the information the officers possessed." *Id.* (citation omitted); *see also Malley*, 475 U.S. at 341 (stating that "if officers of reasonable competence could disagree on [the] issue" of whether a "reasonably competent officer would have concluded that a warrant should issue," then "immunity should be recognized").

*Defendant Miller*

Defendant Miller was the investigating officer and he initiated the criminal proceedings against Plaintiff by seeking the First Warrant. (*See, e.g.*, ECF No. 35 at 1–2.) As such, Defendant Miller was in possession of all the information relevant to his arrest of Plaintiff. However, as noted above, the scope of Defendant Miller's knowledge regarding Plaintiff's involvement in criminal activity is not ascertainable based on the current record of this case. Furthermore, Defendants do not contend—and the record does not otherwise reflect—that Defendant Miller consulted with

anyone beyond the magistrate judge regarding whether there was sufficient probable cause to procure Plaintiff's arrest. *Cf. Wadkins v. Arnold*, 214 F.3d 535, 541–43 (4th Cir. 2000) (noting that the officer's "conference with the Commonwealth's Attorney and the subsequent issuance of the warrants by a neutral and detached magistrate weigh heavily *toward* a finding that [the officer] is immune"). Under this record, the Court finds that there are genuine issues of material fact as to whether a reasonable police officer could have believed that there was probable cause to arrest Plaintiff.[13]

In summary, the Court finds that there are genuine issues of material fact as to the elements of the Section 1983 Malicious Prosecution Claim in Count I and the applicability of qualified immunity as to this claim. Accordingly, the Court **DENIES** Defendant's Motion, insofar as it seeks summary judgment on Plaintiff's Section 1983 Malicious Prosecution Claim in Count I.

*Defendants Peterson and Moyer*

As analyzed above, the record is similarly lacking as to uncontroverted evidence that indicates Defendants Peterson and Moyer had probable cause to arrest Plaintiff. Indeed, the scope of these Defendants' investigation and their corresponding knowledge regarding probable cause is anything but clear.

Nonetheless, the procedures utilized by these Defendants constitutes a factor that weighs heavily in favor of finding that immunity applies. In *Wadkins v. Arnold*, the Fourth Circuit provided the following pertinent discussion regarding the application of qualified immunity when

---

[13] The Court notes that, while the surveillance videos of the thefts are part of the record in this case, (*see* ECF No. 42, Ex. 1), the Court has not viewed these videos. As discussed at length herein, the record reflects that each person who viewed these surveillance videos—the Individual Defendants and the Walmart APM—each provided contradictory statements regarding whether they interpret the videos, and particularly the video of the second theft, as indicating Plaintiff's involvement in criminal activity. As such, the import of the surveillance videos upon the probable cause analysis for Plaintiff's Section 1983 Malicious Prosecution Claims and common-law malicious prosecution claims is in question and properly left to the decider of fact.

an officer both obtains a warrant from a neutral magistrate *and* consults with a legal specialist:

> [The officer's] conference with the Commonwealth's Attorney and the subsequent issuance of the warrants by a neutral and detached magistrate weigh heavily *toward* a finding that [the officer] is immune. At the specific request of the Magistrate, [the officer] conferred with the Commonwealth's Attorney, who in turn explicitly authorized both of the charges in question.
>
> . . .
>
> Admittedly, . . . the record does not fully reveal the extent of the evidence [the officer] presented to the Commonwealth's Attorney. However, [the plaintiff] does not allege that [the officer] acted in bad faith or that he provided misleading information to the Commonwealth's Attorney. Accordingly, any dispute as to what was done during this meeting is immaterial—what is material is that, at the meeting's conclusion, [the Commonwealth's Attorney] authorized the charges against [the plaintiff].
>
> . . .
>
> Of course, the mere fact that [the officer] acted upon the Commonwealth's Attorney's authorization in applying for the warrants does not automatically cloak [the officer] with the shield of qualified immunity. However, this authorization . . . is compelling evidence and should appropriately be taken into account in assessing the reasonableness of [the officer's] actions.

214 F.3d at 541–42; *see also Merchant v. Bauer*, 677 F.3d 656, 664 (4th Cir. 2012) ("We recognized in *Wadkins* . . . that the prosecutor's approval of the criminal charge did not mandate a grant of qualified immunity. Rather, such evidence need only 'appropriately be taken into account in assessing the reasonableness of [the detective's] actions.'" (second alteration in original) (quoting *Wadkins*, 214 F.3d at 542)).

In this case, the record reflects that Defendants Peterson and Moyer consulted with a prosecutor prior to filing the Second Warrant Affidavit and that the prosecutor advised these Defendants to re-file charges against Plaintiff. (*See, e.g.*, ECF No. 34, Ex. E at 117 (providing the following interrogatory response from Defendants: "Sometime after Paul Higginbotham requested

that [Defendants] Moyer and Peterson re-file the charges against [Plaintiff] and before November 7, 2012, [Defendants] Moyer and Peterson spoke with either Assistant Prosecuting Attorney Joey Spano or Assistant Prosecuting Attorney Reagan Whitmyer by telephone and provided a summary of the case and were told to re-file the charges").) While there is conflicting evidence in the record as to the level of information Defendants Peterson and Moyer provided to the prosecutor—the entire file, (*see* ECF No. 34, Ex. D (Moyer Dep.) 24:1–11), or merely a summary, (*see, e.g.*, ECF No. 34, Ex. E at 117)—this distinction is immaterial in the present analysis, *see Wadkins*, 214 F.3d at 542. Additionally, Plaintiff does not argue—and the record does not otherwise reflect—that an exception to this procedural indicia of objective reasonableness applies here, such as that Defendants Peterson and Moyer acted in bad faith, provided false or misleading information to the prosecutor, *see, e.g.*, *Wadkins*, 214 F.3d at 542 (finding that the procedures used by the officer "weigh[ed] heavily *toward* a finding that [the officer was] immune" because, in part, "[the plaintiff did] not allege that [the officer] acted in bad faith or that he provided misleading information to [the prosecutor]"), or omitted exculpatory information when discussing this case with the prosecutor, *see, e.g.*, *Bauer*, 677 F.3d at 665 (finding that the procedures used by the officer did not weigh in favor of immunity where the officer "discovered information tending to exonerate [the person] but nevertheless pursued the charge against her"). *Cf. McKinney v. Richland Cty. Sheriff's Dep't*, 431 F.3d 415, 419 (4th Cir. 2005) ("Both a prosecutor and a neutral and detached magistrate independently reviewed the evidence and concluded that there was probable cause. A reasonable officer would not second-guess these determinations unless probable cause was plainly lacking . . . ." (citation omitted)). Absent such allegations, the procedure Defendants Peterson and Moyer followed in consulting with a prosecutor prior to seeking a warrant for Plaintiff's arrest

weighs heavily in favor of finding that a reasonable police officer could have believed that arresting Plaintiff was lawful.[14] *See, e.g.*, *Wadkins*, 214 F.3d at 541.

However, as the Fourth Circuit noted, these desirable procedures are not dispositive of the issue as to whether an officer's actions were objectively reasonable. Instead, these steps "weigh heavily *toward* a finding that [an officer] is immune," *id.*, and "need only 'appropriately be taken into account in assessing the reasonableness of [the officer's] actions,'" *Bauer*, 677 F.3d at 664 (quoting *Wadkins*, 214 F.3d at 542). As discussed at length above, the record is replete with genuine issues of material fact as to what knowledge, if any, Defendants Peterson and Moyer possessed regarding probable cause at the time they arrested Plaintiff. Without this pertinent information, the laudable procedures Defendants Peterson and Moyer pursued by consulting with a prosecutor are, by themselves, insufficient to find that their arrest of Plaintiff was objectively reasonable at the summary judgment stage. *See, e.g.*, *Bauer*, 677 F.3d at 664 (stating that "the prosecutor's approval of the criminal charge [does] not mandate a grant of qualified immunity" and an officer's "conversation with the state's lawyer does not—as a matter of law—overcome the unreasonableness of the criminal charge and its lack of probable cause"); *Torchinsky v. Siwinski*, 942 F.2d 257, 263 (4th Cir. 1991) ("A reasonable officer in [the officer's] position could view . . . consultations with [his supervisor] as *additional* confirmation that probable cause was present." (emphasis added)).

Based on this analysis, the Court finds that there are genuine issues of material fact as to

---

[14] The Complaint alleges that "Defendants Peterson and Moyer conducted no independent investigation whatsoever into the charges against Plaintiff." (ECF No. 1, Ex. 1 ¶ 42.) However, a recommendation by a prosecutor that officers have sufficient probable cause for an arrest is accorded substantial weight in the objective-reasonableness analysis, regardless of whether an "investigation was incomplete." *Davis v. City of Shinnston*, Civil Action No. 1:12CV53, 2013 WL 4805814, at *6 (N.D. W. Va. Sept. 9, 2013).

whether a reasonable police officer in the position of Defendants Peterson and Moyer could have believed that arresting Plaintiff was lawful. The Court therefore also finds that there are genuine issues of material fact as to whether Defendants Peterson and Moyer are shielded from liability for the Section 1983 Malicious Prosecution Claim in Count II. These issues are properly left to the jury, not the Court.

In summary, the Court finds that there are genuine issues of material fact as to whether (1) Plaintiff can establish the elements of his Section 1983 Malicious Prosecution Claim in Count II; and (2) Defendants Peterson and Moyer are shielded from liability for this claim by the doctrine of qualified immunity. Accordingly, the Court **DENIES** Defendant's Motion, insofar as it requests summary judgment on the Section 1983 Malicious Prosecution Claim in Count II.

### IV.  Section 1983 Claim Against Defendant City

Count III is a Section 1983 claim against Defendant City, which alleges that Plaintiff's rights were violated as a result of Defendant City's "pattern and practice" of inadequately training, managing, and overseeing its officers. (*See* ECF No. 1, Ex. 1 ¶¶ 53 & 55.) Defendants request summary judgment as to Count III on the basis that Plaintiff has failed to show that Defendant City had the requisite policy or custom necessary to sustain this claim. (*See, e.g.*, ECF No. 35 at 16–18.) Plaintiff responds that there is a genuine issue of material fact as to the relevant policies of Defendant City. (*See, e.g.*, ECF No. 39 at 13.)

"In *Monell v. New York City Dep't of Social Services*, . . . the Supreme Court interpreted § 1983 to permit a municipality to be held liable for constitutional deprivations resulting from its employees' conduct." *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (citing 436 U.S. 658, 694 (1978)); *see also Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397,

403 (1997) ("[M]unicipalities and other local governmental bodies are 'persons' within the meaning of § 1983." (citing *Monell*, 436 U.S. at 689)). "Nevertheless, 'Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Semple*, 195 F.3d at 712 (quoting *Monell*, 436 U.S. at 691). Consequently, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994) (citing *Spell v. McDaniel*, 824 F.2d 1380, 1387–88 (4th Cir. 1987)); *see also Bryan Cty.*, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A] governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation; thus, in an official-capacity suit the entity's policy or custom must have played a part in the violation of federal law." (citations omitted)). "Thus, a prerequisite to municipal liability is the finding that an official policy or custom existed." *Semple*, 195 F.3d at 712.

"A government policy or custom need not have received formal approval through the municipality's official decisionmaking channels to subject the municipality to liability." *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 522 (4th Cir. 2000). "Rather, when an alleged

64

constitutional deprivation is caused by the official actions of those individuals 'whose edicts or acts may fairly be said to represent official policy,' the government as an entity is responsible under section 1983." *Id.* (quoting *Monell*, 436 U.S. at 694). "Because section 1983 was not designed to impose municipal liability under the doctrine of respondeat superior, the 'official policy' requirement was 'intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)).

Count III alleges that Defendant City is "independently liable" under a theory of "failing to train" the Individual Defendants "on the necessary steps to take in conducting an investigation and the need for each arresting law enforcement officer to independently insure that the probable cause requirement is satisfied."[15] (ECF No. 1, Ex. 1 ¶ 53; *cf.* ECF No. 39 at 13 (providing Plaintiff's argument that there is "a genuine dispute" as to Defendant "City's policy and custom that its police officers are free to apply for arrest warrants whenever they feel like it and against whomever they feel like arresting, so long as a magistrate judge signs off on it").) "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes

---

[15] In his opposition briefing to Defendant's Motion, Plaintiff argues that his "claims against [Defendant City] are premised on the [Defendant] City's policy and custom that its police officers are free to apply for arrest warrants whenever they feel like it and against whomever they feel like arresting, so long as a magistrate judge signs off on it." (ECF No. 39 at 13.) However, Count III never alleges such a "policy or custom." (*See* ECF No. 1, Ex. 1 ¶¶ 48–58.) Rather, it is clearly a failure-to-train claim, which alleges that Defendant City failed to train the Individual Defendants "on the necessary steps to take in conducting an investigation and the need for each arresting law enforcement officer to independently insure [sic] that the probable cause requirement is satisfied." (*Id.* ¶ 53.) As such, the Court shall apply the appropriate standard pursuant to *City of Canton v. Harris*, 489 U.S. 378 (1989), and its progeny. *See, e.g.*, *Rowell v. City of Hickory*, 341 F. App'x 912, 915 (4th Cir. 2009) (stating that *Canton* "provides the standard for . . . liability" for municipalities based on "inadequacy of police training").

of § 1983." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* (citation omitted); *cf. Okla. City v. Tuttle*, 471 U.S. 808, 822 (1985) (stating that a "policy" of "inadequate training" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

The Supreme Court's decision in *City of Canton v. Harris*, 489 U.S. 378 (1989), and its progeny provide the standard for Section 1983 claims against municipalities based on a theory of inadequate police training. *See, e.g.*, *Rowell v. City of Hickory*, 341 F. App'x 912, 915 (4th Cir. 2009) (stating that *Canton* "provides the standard for . . . liability" for municipalities based on "inadequacy of police training"); *Buffington v. Balt. Cty., Md.*, 913 F.2d 113, 122 (4th Cir. 1990) ("In *Canton*, the Supreme Court outlined the circumstances under which a municipality can be held liable under § 1983 for constitutional violations resulting from a policy of failing to train municipal employees."). In *Canton*, the Supreme Court held "that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 388. *See generally Buffington*, 913 F.2d at 122 (noting that the deliberate indifference standard provided in *Canton* "was thought necessary to reconcile the failure-to-train theory of liability, which alleges a policy of omission, with the principle that § 1983 municipal liability can attach only when the municipality's policy represents 'a deliberate choice [by the municipality's authorized policymakers] to follow a course of action . . . made from among various alternatives'" (alterations in original) (quoting *Pembaur*, 475 U.S. at 483–84)). "Only then 'can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983.'" *Connick*, 131 S.

Ct. at 1359–60 (citing *Canton*, 489 U.S. at 389).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [its] action." *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 410 (1997). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 131 S. Ct. at 1360 (citing *Bryan Cty.*, 520 U.S. at 407). *See generally Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) ("Actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body. Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." (citation omitted)). "The city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Id.* (quoting *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)).

"Deliberate indifference for purposes of failure to train can be shown in one of two ways." *DeHaven v. W. Va. Div. of Corrs.*, No. 2:14–CV–16156, 2014 WL 2765612, at *4 (S.D. W. Va. June 18, 2014). "First, a plaintiff may point to a pattern of constitutional violations by employees to demonstrate deliberate indifference on the part of the supervisors [or policymakers]." *Id.* (citing *Connick*, 131 S. Ct. at 1360). The Supreme Court noted that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 131 S. Ct. at 1360 (quoting *Bryan Cty.*, 520 U.S. at 409).

Case 2:14-cv-00330   Document 125   Filed 09/10/15   Page 68 of 78 PageID #: 2366

"Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability.'" *Id.* (quoting *Bryan Cty.*, 520 U.S. at 407).

In this case, the record does not reflect that Defendant City's police officers engaged in a pattern of constitutional violations by failing to provide probable clause in warrant affidavits, or by arresting individuals without probable cause. Instead, Plaintiff only provides evidence of his two arrests—which were roughly four months apart—and the deficient warrant affidavits that led to these arrests. (*See, e.g.*, ECF No. 39 at 2–6.) Importantly, the record also fails to provide any indication that Defendant City was either actually or constructively aware of such constitutional violations. These facts fail to support a theory of deliberate indifference based on the "pattern" standard of failure-to-train liability. *See, e.g.*, *Connick*, 131 S. Ct. at 1360 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."); *Hatley v. Bowden*, No. 5:13–CV–765–FL, 2014 WL 860538, at *4 (E.D.N.C. Mar. 5, 2014) (dismissing the plaintiffs' failure-to-train claim where they "point[ed] to no prior incidents, or other factors, showing that [the defendant municipality] was on notice that a failure to specifically train officers" in dealing with the factual situation raised in the complaint "was likely to lead to a constitutional violation").

"Second, a supervisor [or policymaker] may be liable for a single, isolated incident where the need for training with respect to the subordinate's conduct was 'plainly obvious.'" *DeHaven*, 2014 WL 2765612, at *4 (quoting *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000)); *see also*

68

*Brown v. Mitchell*, 308 F. Supp. 2d 682, 706 (E.D. Va. 2004) ("[A]s Justice O'Connor's separate opinion in [*Canton*] makes clear, there are, in fact, two categories of failure to train cases, one involving a pattern of constitutional deprivations and one involving singular deprivations of more obvious rights."). Thus, "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bryan Cty.*, 520 U.S. at 409 (citing *Canton*, 489 U.S. at 390); *cf. Spell*, 824 F.2d at 1390 ("[T]raining policy deficiencies for which municipal liability may be imposed include not only express authorizations of specific constitutional conduct, but tacit authorizations, *and failures adequately to prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty*." (emphasis added)). In *Canton*, the Supreme Court provided the following description of this failure-to-train theory of liability:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

489 U.S. at 390; *see also Bryan Cty.*, 520 U.S. at 409 ("The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice-namely, a violation of a specific constitutional or statutory right."). The *Canton* Court then provided the following example of where this theory of liability may be appropriate:

69

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

489 U.S. at 390 n.10. Pursuant to *Canton*, courts in this District recognized causes of action pursuant to this failure-to-train theory of liability in certain situations, such as where a municipality (1) "did not train its officers how to properly and lawfully apprehend a suspect," *Woods v. Town of Danville, W. Va.*, 712 F. Supp. 2d 502, 512–13 (S.D. W. Va. 2010) (denying the defendants' motion for summary judgment as to the Section 1983 claim against the municipality where it was "undisputed that officers were not required to be certified to carry a firearm before they became a . . . police officer" and the municipality "did not train its officers how to properly and lawfully apprehend a suspect, but rather" turned them loose "essentially unsupervised, after only a week of riding with [the police chief] and filling out mock reports"); and (2) allegedly "failed to adequately train their correctional officers to protect the known and substantial risk of harm by other inmates" in a maximum-security prison, *DeHaven*, 2014 WL 2765612, at *4 (denying the defendants' motion to dismiss the plaintiff's failure-to-train claim against supervisors where the complaint alleged "that subordinate officers failed to prevent the plaintiff from being attacked by [another] inmate . . . and that they failed to reasonably intervene to stop the attack once it began").

The Supreme Court noted, however, that this single-incident theory of liability will only apply "in a narrow range of circumstances." *E.g., Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 398 (1997) ("[T]he *Canton* Court simply hypothesized that, in this narrow range of circumstances, the violation may be a highly predictable consequence of the failure to train and thereby justify a finding of 'deliberate indifference' by policymakers."). Nonetheless, by

creating this additional permissible showing, "[t]he Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011).

Recognizing that this single-incident theory of liability is a narrow species of a failure-to-train claim against a municipality, the Court nonetheless finds that this claim survives summary judgment. As discussed above, the constitutional rights of individuals to only be arrested with probable cause and, if there is a warrant, based on warrants establishing probable cause are clearly established. No police officer could reasonably dispute that these are established rights. Furthermore, these rights are undoubtedly implicated every time a police officer either seeks a warrant for an arrest, or performs an arrest pursuant to a warrant.

The record also shows that there are genuine issues of material fact as to whether the Individual Defendants' established or disputed violations of obvious constitutional rights were the result of Defendant City's failure to train the Individual Defendants—or any of its officers—as to the constitutional rights pertaining to probable cause for arrests and arrest warrants. In particular, Defendant City's police procedures manual[16] provides the following under the heading "Arrest With a Warrant":

> No officer shall arrest any person under color of a warrant unless he/she reasonably believes a valid warrant exists and that the person described in the warrant is before him/her. A valid arrest warrant must contain specific information as required by statute and court decisions. Such information includes:

---

[16] The Court notes that Plaintiff attached only excerpts of this purported police procedures manual to his opposition briefing to Defendant's Motion, as well as that this document does not include a title page or publication date. (*See* ECF No. 39, Ex. 5.) However, the "Introduction & Purpose" section of this document indicates that it is the Police Department's "manual." (*Id.* ¶ 1.0.) Additionally, during his deposition testimony, Defendant Miller stated that this manual is his Police Department's "rules and regulations." (ECF No. 34, Ex. C (Miller Dep.) 260:14–261:6.) Defendants also do not contest in their briefing that this document contains excerpts of the Police Department's manual. (*See* ECF No. 42 at 9–11.)

- The authority under which the warrant is issued
- Identification of the person who is to execute the warrant, generally addressed: To any sheriff, deputy sheriff, coroner, constable, marshal, or police officer
- Identification of the person to be arrested
- The name of the offense committed
- The date and place of occurrence of the offense, including the county in which it was committed
- Identification of the victim
- A description of the offense, including all of the elements of the offense.

In addition, when the offense charged is a theft, the warrant must contain:

- A description of the property alleged to have been stolen
- Identification of the owner of the stolen property
- The value of the stolen property
- The person from whose possession it was taken

NOTE: Without strict compliance with the above, the warrant may not be valid.

(ECF No. 39, Ex. 5 ¶ 21.7.4.) At no point does this section in the Police Department's manual reference the constitutional requirements that (1) an officer seeking a warrant must provide an oath or affirmation supporting a probable cause finding, or (2) an officer should only arrest an individual pursuant to a warrant if they have probable cause. (*See id.*) Indeed, this section does not even mention that a valid warrant provides probable cause for the alleged offenses. (*See id.*) Additionally, Defendants do not direct the Court to any other sections of Defendant City's police procedures manual that addresses these probable cause issues. These omissions from the manual are striking.

There is also contradictory evidence in the record—apart from the Police Department's manual—as to whether Defendant City trains its police officers on these constitutional requirements. During his deposition, Defendant Miller testified that he received more training on arrest warrants than search warrants. (*See* ECF No. 34, Ex. C (Miller Dep.) 257:4–16.) However, the scope of that training is far from clear. Indeed, Defendant Miller indicated that he did not receive training addressing the constitutional requirement that an oath or affirmation in support of

72

an arrest warrant must support a finding of probable cause. (*See id.* 280:2–281:11.) The above-referenced Police Department manual and Defendant Miller's testimony raise serious questions as to the exact training Defendant City provides to its officers regarding probable cause in situations likely to recur both frequently and predictably—seeking arrest warrants and performing arrests pursuant to warrants. *Cf. Bryan Cty.*, 520 U.S. at 409 ("[E]vidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." (citing *Canton*, 489 U.S. at 390)).

However, the analysis pertaining to a single-incident theory of liability does not end here, as "the [C]ourt must go one step further and conduct a causation inquiry." *Woods*, 712 F. Supp. 2d at 513. "In order for liability to attach to the municipality, 'the identified deficiency . . . must be closely related to the ultimate injury.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)); *see also Bryan Cty.*, 520 U.S. at 411 ("A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional . . . right will follow the decision."); *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) ("[M]unicipal liability will attach only for those policies or customs having a '*specific* deficiency or deficiencies . . . such as to make the *specific* violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run.'" (alterations in original) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987))). As such, the pertinent question is "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Canton*, 489 U.S. at 391.

In this case, the genuine issues of material fact pertaining to the training Defendant City

73

provides its officers regarding probable cause for arrest warrants and arrests pursuant to warrants have direct causal relationships with the established or disputed constitutional violations. Simply put, Plaintiff may credibly argue that if Defendant City failed to train its officers regarding these constitutional limitations, then the Individual Defendants would not have committed these established or disputed constitutional violations. Furthermore, these constitutional violations are certainly predictable if there was a lack of such training, and this predictability supports an inference that the requisite causation is present in this case. *See Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 409–10 (1997) (stating that "[t]he high degree of predictability" in a failure-to-train case based on a single-incident theory of liability "may also support an inference of causation-that the municipality's indifference led directly to the very consequence that was so predictable"). As such, the Court finds that there are genuine issues of material fact as to the causation requirement for municipality liability.

Based on the foregoing, the Court finds that the constitutional requirements pertaining to providing an oath or affirmation supporting a finding of probable cause for arrest warrants and having probable cause to arrest an individual are so obvious that a municipality's failure to train its officers regarding these constitutional limitations constitutes deliberate indifference. The Court further finds that there are genuine issues of material fact as to whether Defendant City does, in fact, train its officers regarding these constitutional limitations. These factual determinations are properly left to the decider of fact.

Accordingly, the Court **DENIES** Defendants' Motion insofar as it requests summary judgment on Count III.

## V. *Common-Law Malicious Prosecution Claims Against the Individual Defendants*

Defendants also request summary judgment on the common-law malicious prosecution claims against Defendant Miller (Count IV) and Defendants Peterson and Moyer (Count V).[17] (*See* ECF No. 35 at 18–21.) Plaintiff argues that there are genuine issues of material fact as to the pertinent elements in these claims. (*See, e.g.*, ECF No. 39 at 13–14.) The Court again agrees with Plaintiff's position.

There is no dispute that a common-law claim for malicious prosecution under West Virginia law includes the following four elements:

> (1) that the prosecution was set on foot and conducted to its termination, resulting in [the] plaintiff's discharge; (2) that it was caused or procured by [the] defendant; (3) that it was without probable cause; and (4) that it was malicious.

*E.g.*, *Morton v. Chesapeake & Ohio Ry. Co.*, 399 S.E.2d 464, 465 (W. Va. 1990). "If [the] plaintiff fails to prove any of these [elements], he [cannot] recover." *Id.* (quoting *Truman v. Fid. & Cas. Co. of N.Y.*, 123 S.E.2d 59, 69 (1961)). The West Virginia Supreme Court of Appeals provided the following statement regarding the policy behind a common law malicious prosecution claim:

> [P]ublic policy favors prosecution for crimes and requires the protection of a person who in good faith and upon reasonable grounds institutes proceedings upon a criminal charge. The legal presumption is that every prosecution for crime is founded upon probable cause and is instituted for the purpose of justice.

*Id.* at 467 (quoting *Truman*, 123 S.E.2d at 69). "Due to its potential chilling effect, the tort of malicious prosecution traditionally has been disfavored." *Cunard v. Mylan Pharm., Inc.*, Civil Action No. 2:06-CV-00640, 2006 WL 3692648, at *5 (S.D. W. Va. Dec. 13, 2006) (citing

---

[17] In Defendants' Motion, Defendants characterize Counts IV and V as "malicious prosecution claim[s] brought under section 1983." (ECF No. 35 at 18.) However, both Counts IV and V plainly state they are brought only "under the statutes and common law of the State of West Virginia." (ECF No. 1, Ex. 1 ¶¶ 65 & 72.) As such, the Court construes Counts IV and V as common-law malicious prosecution claims under West Virginia law.

*McCammon v. Oldaker*, 516 S.E.2d 38, 45 (W. Va. 1999)).

Defendants do not challenge whether Plaintiff satisfies the first two elements. (*See, e.g.*, ECF No. 97 at 12–14.) Instead, Defendants contend that the record does not support the third and fourth elements—probable cause and malice. (*See, e.g.*, *id.* at 13 ("In the present case there is no conflict of evidence as to the existence of malice and a lack of probable cause in this case because there is no evidence of either."); *see also id.* at 12 ("The Plaintiffs [sic] claim for [m]alicious prosecution must fail because they [sic] can establish neither a lack of probable cause for the arrest or the additional requirement that the defendants acted with malice.").) The Court will therefore address the probable cause and malice elements of Plaintiff's common-law malicious prosecution claims.

"In civil malicious prosecution actions, the issues of malice and probable cause become questions of law for the court where there is no conflict of evidence or where there is only one inference to be drawn by reasonable minds." *Morton*, 399 S.E.2d at 467 (citing *Truman*, 123 S.E.2d at 70). Turning to the issue of probable cause, the West Virginia Supreme Court of Appeals provided the following description of this principle in the context of a malicious prosecution claim:

> Probable cause for instituting a prosecution is such a state of facts and circumstances known to the [defendant] personally or by information from others as would in the judgment of the court lead a man of ordinary caution, acting conscientiously, in the light of such facts and circumstances, to believe that the person charged is guilty.

*Id.* (citation omitted). As discussed at length above, the record is riddled with inconsistencies and questions of fact as to what knowledge the Individual Defendants possessed when they executed the respective arrests of Plaintiff. As such, there are genuine issues of material fact as to this issue for purposes of Plaintiff's malicious prosecution claims against these Defendants.

As to the malice element, West Virginia courts define "malicious" for purposes of a malicious prosecution claim as "'[s]ubstantially certain to cause injury' and 'without just cause or excuse.'" *Clark v. Druckman*, 624 S.E.2d 864, 871 (W. Va. 2005) (quoting *Black's Law Dictionary* 977 (8th ed. 2004)). "This definition implies an improper or evil intent or motive or the intent to do harm." *Id.* In the context of a malicious prosecution claim under West Virginia law, "malice may be inferred by a lack of probable cause." *Morton*, 399 S.E.2d at 467; *see also Hunter v. Beckley Newspapers Corp.*, 40 S.E.2d 332, 333 (W. Va. 1946) ("Malice may be inferred from the prosecution of a civil suit, action or proceeding, or a criminal charge, where want of probable cause for such prosecution is shown by a preponderance of the evidence.").

The Court found that there are genuine issues of material fact as to the issue of whether the Individual Defendants had probable cause to arrest Plaintiff. The Court therefore also finds that there are likewise genuine issues of material fact as to the presence of malice, for purposes of the instant malicious prosecution claims. *See, e.g.*, *Morton*, 399 S.E.2d at 467.

As the Court finds that there remain genuine issues of material fact as to the contested elements of Plaintiff's common-law malicious prosecution claims against the Individual Defendants, it also finds that summary judgment in favor of Defendants is inappropriate at this juncture. Accordingly, the Court **DENIES** Defendant's Motion insofar as it requests summary judgment on Counts IV and V of the Complaint.

## VI. Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion, (ECF No. 36), insofar as it requests summary judgment on the Deficient-Affidavit Claim against Defendant Miller in Count I. The Court **DENIES** Plaintiff's Motion, (*id.*), insofar as it requests summary judgment as

to the Deficient-Affidavit Claim against Defendants Peterson and Moyer in Count II. The Court further **DENIES** Defendants' Motion, (ECF No. 34), in its entirety.

      **IT IS SO ORDERED**.

      The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

                ENTER:      September 10, 2015

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE